FILED

NOV 2 9 2011

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ODETTE LANGER,                          )
                                        )      Judge DOW JR.
            Plaintiff,                  )
                                        )
            v.                          )      Case No.  11 CV 5226
                                        )
BOARD OF EDUCATION OF THE CITY  Of      )
CHICAGO.                                )
                                        )
            Defendant.                  )
                                        )

*Amended* .    COMPLAINT

Plaintiff, Odette Langer, appearing pro se, complains of the Defendant, Board of

Education of the City of Chicago ("Board") as follows:

1.      Plaintiff brings this action seeking redress from employment discrimination in

violation of:

(a) Age Discrimination Employment Act and

(b) Title VII of the Civil Rights Act of 1964 as amended and 42 U.S.C. 1981.

2.      Plaintiff further brings this action in regard to denial of property rights, a subject

of the Fourteenth Amendment and brings this action under the requirements of Illinois State

law.

3.      Plaintiff was a resident of Chicago, Illinois at all times relevant to this complaint.

4.      Defendant, the Board, is a body politic organized and existing under the Illinois

School Code, located at 125 S. Clark Street in the County of Cook and the State of Illinois.  The

Board operates the Chicago Public Schools ("CPS"), District 299, County of Cook, and State of

Illinois.

1

5.   All conditions precedent for jurisdiction under 42 U.S.C. 2000e-5 have been complied with for purposes of this complaint as follows:

6.  Plaintiff filed a charge complaint with the Equal Employment Opportunity Commission ("EEOC") on April 14, 2011 and therein the charges stated additional "Pages to follow", two additional pages were filed for attachment on April 18, 2011; plaintiff did not have time to file more pages **(EXHIBIT 1)**.

7.  The EEOC issued its right to sue on April 27, 2011.  It was received on May 3, 2011 **(EXHIBIT 2)**.

8.  Plaintiff has timely filed her complaint within 90 days of receiving her Notice. of Right to Sue letter.

9.   This civil action properly lies in the Northern District of Illinois, Eastern Division, pursuant to 28 U.S.C. 1391, because the claims situated in the complaint arose in this District.

**10.        PLAINTIFF'S EDUCATIONAL AND LEADERSHIP BACKGROUND
WHILE EMPLOYED BY DEFENDANT**

11.    Plaintiff received a master's degree in education from DePaul University.

12.    Plaintiff was president of the DePaul University Educational Honor Society for six years while taking post-graduate courses.

13.    Plaintiff took a very large number of graduate courses and was taking courses for many years.  She might have taken enough courses for a doctorate degree, although she never applied to receive one.

14.    Plaintiff was one of four assistant principals that received the outstanding leadership award given by the Chicago Principals and Administrators Association.  Most Chicago principals,

2

assistant principals, and administrators belong to that association. Attached congratulatory letters are from the Chicago Public Schools (CPS) Deputy Chief Education Officer **(EXHIBIT 3)** and from the CPS Office of Academic Enhancement **(EXHIBIT 4)**.

15.     Plaintiff passed the examination for becoming Superintendant of Schools in Illinois. **(EXHIBIT 5)**.

16.                    **BOARD RECORDS SHOW THAT**
**PLAINTIFF RECEIVED THE HIGHEST PERFORMANCE RATINGS AS A TEACHER,**
**A TEAM LEADER, AND A SUPERVISOR OF A MATHEMATICS PROGRAM.**

17.     Plaintiff began her employment with the Board in 1967 as a teacher, at a Cabrini-Green housing project school in the high crime area of Chicago's inner city. She started at Schiller School when it had primary grades and then its sister school Sojurner Truth School when Schiller became an intermediate grade school and Truth School took over primary grades.

18.     At Schiller Elementary School, plaintiff team taught language art and math and she organized instructional teams.

19.     At Sojurner Truth Elementary school plaintiff started as a class room teacher teaching students in grade 3 using learning style groupings. She then became team leader and supervised the school's Intensive Math Improvement Program. She created a monitoring system for tracking student progress; participated with the principal, assistant principal, and counselor in planning school wide goals.

20.     While being a teacher, plaintiff, repeatedly received Superior performance ratings that included reference to her high leadership quality. **(EXHIBITS 6 AND 7)**.

21.         **THE BOARD'S CENTRAL OFFICE SELECTED PLAINTIFF
TO WRITE AND GIVE TRAINING ON MATHEMATICS PROGRAMS.**

22.    The Board's Central Office mathematics department selected plaintiff to work part time

after school and during summers to write a Mastery Learning Mathematics Program, in-service

teachers at various schools, monitor and evaluate summer school programs at 30 schools, and

train high school students to tutor in summer school programs.  She also participated in giving

work shops to teachers including two work shops at Lane High School.  And she gave a

presentation to the Illinois Council of Teachers of Mathematics at Northeastern University.

23.         **WHEN PLAINTIFF BECAME AN ASSISTANT PRINCIPAL
SHE EXCEEDED THE HIGHEST PERFORMANCE EVALUATION RATINGS.**

24.    The principal of Barry School, after interviewing 12 people, selected plaintiff to be the

school's reading resource teacher in June 1990. and then to become her acting assistant

principal in September 1990.  Plaintiff became Barry School's freed assistant principal in May

1997.   Plaintiff was consistently given the highest performance rating of exceeding

expectations when that designation was being used in performance evaluations.   At times the

number of performance points given her exceeded the maximum number of points given to

assistant principals because plaintiff was performing some of the work of a principal **(EXHIBITS

8 and 9)**.

25.         **PLAINTIFF, ONE OF FIFTY APPLICANTS,
WAS UNANIMOUSLY ELECTED PRINCIPAL,
ONLY LSC MEMBER EDILBERTO AVILES ABSTAINED
BECAUSE HE WANTED THE PRINCIPAL TO BE HISPANIC.**

26.    The Local School Council (LSC) members unanimously elected Plaintiff to be given a four

4

year contract that could be renewed, to be principal of Barry School when the previous

principal retires. There had been approximately 50 applicants for the position. One Hispanic

LSC member, Edilberto Aviles, who wanted the principal to be an Hispanic, abstained from

voting because the Plaintiff was not an Hispanic. He also convinced the other LSC members to

have the school staff vote as to whether Plaintiff should be principal, but not to have them vote

as to whether any other applicant should be principal. The school staff unanimously voted that

Plaintiff should be principal.

**27.     LSC MEMBER MR. AVILES CONTINUOUSLY TRIED TO MAKE TROUBLE FOR
          PLAINTIFF AND SUBMIT FALSE CHARGES AGAINST HER.**

28.     This occurred from the time that he was the only one that abstained from voting for

Plaintiff as principal because he wanted the principal to be a Hispanic, not Jewish, and a

younger person than Plaintiff to the time that he deliberately would not attend and

participate in an LSC meeting that was scheduled to evaluate Plaintiff's performance on June

10, 2010, at the end of her third year as principal of Barry School.

29.     The above LSC performance evaluation on June 10, 2010 of Plaintiff's performance as

principal of Barry School gave her the highest evaluation score that of exceeding the seven

performance goals of a principal.

30.     During the above period, Mr. Aviles in association with another Hispanic person who

soon became an LSC member continuously attacked Plaintiff approximately every two weeks

with letters to about five Chicago Public Schools officials, Chicago's Mayor, the Alderman, and

even the Illinois Attorney General, and to Plaintiff's immediate supervisor Chief Area Officer,

5

Mr. Kallas.

31.     Mr. Aviles, using false charges, also wanted to have the Illinois Attorney General

get after Plaintiff based on the Open Meetings Act.  Mr. Aviles was not satisfied by just

complaining about Plaintiff to top Officials at the Chicago Public Schools.  He was trying to make

headlines in the newspapers.

32.     On Tuesday March 10, 2009, Plaintiff sent an E-mail to LSC member Aviles and other LSC

members requesting a short emergency LSC meeting for either Thursday or Friday for LSC

approval of allocation of funds for parent training **(Exhibit 10).**

33.     Verification that the E-Mail was sent to Aviles is given by the Postmaster's Delivery

Status Notification on March 10, 2009 which states that the message was successfully relayed

to  Mr. Aviles. **(Exhibit 11).**

34.     On March 11, 2009, Plaintiff sent another E-Mail to Mr. Aviles stating that there will be

at least 7 members able to come on Thursday for the emergency LSC meeting.  Please let me

know if you will be able to come at the above date. **(Exhibit 12).**

35.     The Postmaster's Delivery Status Notification on March 11, 2009 stated that the

message has been successfully delivered to Aviles. **(Exhibit 13).**

36.     On the evening of March 12, 2009, Mr. Aviles sent an E-Mail **stating: "I plan on**

**contacting the States Attorneys Office"** to 1: Jose Alvarez, CPS Director of Community

Relations, with copies to 2: Ms. Erios, who may be the director of an organization that helped

the Hispanic members on an LSC to not renew the contract of a Black principal who complained

about discrimination by the Hispanic members of an LSC who wanted a Hispanic principal; 3:
c
Flavia Hernandez, Chief Area Officer  4: Eason-watkins, Barbara J, Chief Education Officer;

5: Aida Montijo, LSC Laison, 6: Jose Villasenor, who works for the CPS with LSCs and

Community Relations; 7: Ray Suarez, Alderman; 8: Joseph Kallas, Chief Area Officer: and

9: Plaintiff. **(Exhibit 14, bottom of page).**

37.    On March 13, 2009, Mr. Aviles received replies from Mr.Villasenor **(Exhibit 15, top of**

**page)** and from Mr. Alvarez **(Exhibit 16).**

38.    On March 13, 2009, Mr. Kallas sent Plaintiff an E-Mail with a copy of Mr. Aviles' E-Mail

to Mr. Jose Alvarz. And asked her to tell him exactly what happened.

39.    On March 16, 2009, Mr. Kallas sent an E-Mail to Mr. Villasenor with copies to Mr.

Alvarez, Ms. Montijo, and Plaintiff that stated: "FYI principal Odette Langer has provided me

copies of both the E-mail she sent to Mr. Aviles and the posting of the meeting. She also has a

copy of the delivery notification. I feel confident that Ms. Langer tried to contact Mr. Aviles

about this meeting. Joe Kallas" **(Exhibit 17).**

40.    On March 25, 2009, Mr. Kallas stated that the State Attorney General was still

investigating the matter. Presumably, Mr. Kallas told the State Attorney General the true facts

and the State Attorney General could verify the facts himself. Plaintiff did not hear anything

from the Attorney General and presumably Mr. Aviles' charges were dismissed.

41.    Insofar as Plaintiff knows the Chief Education Officer Eason-Watkins; Chief Area

Officer Flavia Hernandez, and Alderman Ray Suarez were never notified that evidence proved

that the E-Mails that Mr. Aviles stated were not sent to him were in fact sent to him.

**42.**    Mr. Aviles repeatedly complained that notices were not being posted about LSC

meetings, although there was a notice on the bulletin board near the buildings entrances,

mailings were sent out with reference to LSC meeting dates, and posted on a lighted sign in

7

front of the school building, and people from the Chief Area Office saw them.

## Mr. AVILES NEXT MAJOR COMPLAINT TWO WEEKS LATER

43.     Prior to one LSC meeting on March 25, 2009 information was received that Mr. Aviles

and another LSC member had been observed passing out flyers to selected parents it is

believed to come and complain about a crisis at Barry School.  And he sent out an E-mail

(March 23, 2009) with the "Subject: Barry School Crisis" "Importance: High" to Plaintiff's

immediate supervisor, Chief Area Officer Joseph Kallas with copies to Flavia Hernandez, Chief

Area Officer; Barbara Eason-watkins, Chief Educational Officer, Ray Suarez, Alderman, Ms. Erios

who it is believed worked with the Hispanic members of a school LSC to get rid of a Black

principal who complained about discrimination by the Hispanic members of that school's LSC.

The E-mail stated "Over the past year and half we have had several concerning issues take place

at Barry School" (which is the period at the start of Plaintiff's employment as principal.) "We

are asking you to please attend ... so that parents and staff can voice their concerns."  "Morale

among both parents and staff is at an all time low."

        On 3/24/2009, Mr. Kallas sent to Aviles an E-Mail  with "Subject: RE: Barry School Crisis"

with copies to all the above officials.  The E-Mail stated "I had planned to attend another LSC

meeting that evening.  However, I will attend the Barry meeting instead."

        Plaintiff somehow obtained a copy of the E-mails and sent a copy to other LSC members.

It stated "This is becoming completely out of hand.  I already have many teachers and staff that

will attend the meeting and they are furious at his accusations.  He is keeping the LSC from

functioning and he is trying to ruin my reputation.  Something has got to be done." **(Exhibit 18,**

**2 pages)**

44.     Very  few  parents showed up and only one person had a complaint; it was that there

was not enough toilet paper in the washroom. The parent stated that she did not tell any

teacher about that.  Teachers, at the meeting, stated that if that occurred, they would have it

corrected immediately.  (Teachers escort students to the washroom and they would know if

8

there was insufficient paper). The janitor who was present stated that he checks the washrooms every day and sometimes children throw a lot of toilet paper into the toilet.

45.     Another parent congratulated Plaintiff about her performance.

46.     Barry School was one of the few schools that received an A in cleanliness. Although the school sometimes received a B like most other schools.

## ANOTHER AVILES FALSE COMPLAINT

47.     About the anniversary of Mr. Aviles false complaint about his not receiving E-Mails about an LSC meeting, Mr Aviles, on March 24, 2010, submitted another of his false complaints. This time it was to Hanna Kapica, an LSC coordinator. Ms. Kapica, in turn sent copies of Aviles complaint to Mr. Vallasenor and Chief Area Officer Joseph Kallas, without first checking with Plaintiff. Mr. Aviles' complaint stated: "We have parents trying to turn in LSC applications and they are being told that the LSC facilitator is not present and will not be in at all today.**(Exhibit 19).**

48.     The person responsible for taking applications said that the Aviles charge was not true. She requested of the Chief Area Officer and one of his involved assistants as to who were the parents, but she was not given any such information. No parent made that claim to the principal and no parent signed in with the security guard during the alleged period that applications were not taken. **The person that took applications that day wrote to the Chief Area Officer, Mr. Kallas. with a copy to his assistant that: "It seems to me that he" (Mr. Aviles) "has a personal vendetta to follow and actions of this matter does not belong to the LSC. The LSC is to interact positively with the community and the school." Some time later, Plaintiff retrieved a copy that was sent to her. (Exhibit 20).**

## MR. AVILES CONTINUED HIS ATTACKS AGAINST PLAINTIFF

27.     LSC MEMBER AVILES AGAIN ABSTAINED. THIS TIME FROM PARTICIPATING IN OR ATTENDING THE LSC PERFORMANCE EVALUATION MEETING THAT GAVE PLAINTIFF, AT THE END OF HER THIRD YEAR AS PRINCIPAL, AN EXCEEDS THE REQUIREMENTS FOR A PRINCIPAL.

28.    Mr. Aviles failed in his attempt to prevent Plaintiff from becoming principal of Barry School and abstained from voting for her to become principal.

29.    Again, on June 9, 2010, prior to the June 10, 2010 LSC evaluation of Plaintiff's performance as principal near the end of her third year as principal, Mr. Aviles sent an E-mail to the chairperson of the LSC.

30.    Mr. Aviles' E-mail to the LSC chairperson stated that he would not participate and waste his time arguing about Plaintiff's accomplishments with the other members of the LSC, "a group of people who have done nothing but enable her to lie and bring harm to our children, teachers, and our community." (Exhibit 21).

31.    Incidentally, Plaintiff would not be permitted to be present during a LSC discussion and evaluation of her performance.

32.    On June 10, 2010, the LSC members that voted gave Plaintiff the highest rating of exceeding the seven performance goals for a principal. (Exhibit 22)

**33.    THE ABOVE LSC EVALUATION OCCURRED PRIOR TO THE LSC KNOWING THAT PLAINTIFF'S SCHOOL WAS GIVEN THE BOARD'S HIGHEST EXCELLENCE PERFORMANCE LEVEL RATING AND HER SCHOOL HAD RECEIVED THE TENTH HIGHEST VALUE-ADDED READING SCORE OF ALL SCHOOLS IN THE CITY OF CHICAGO AND WITH THE PLAINTIFF'S NAME BEING SHOWN.**

34.    The LSC ratings were independent of the Board's Highest Excellence Performance Level Rating and the tenth highest Value-Added Reading Score of all schools in Chicago and those very high ratings that Plaintiff received were independent of the LSC ratings. (Exhibits 23 &24)

**35.    THE LSC CHAIR SENT A COPY TO CHIEF AREA OFFICER, KALLAS, OF LSC MEMBER AVILES' 6/9/2010 E-MAIL, DENOUNCING THE LSC MEMBERS WHO WOULD ATTEND AND PARTICIPATE IN EVALUATING THE PERFORMANCE OF THE PLAINTIFF AS PRINCIPAL AT THE 6/10/2011 LSC MEETING SCHEDULED FOR THAT PURPOSE.**

36.    The LSC Chair sent Mr. Aviles' 6/9/2011 E-Mail to Mr. Kallas on 6/11/2010. Plaintiff was handed her evaluation on 6/11/2010 by the LSC Chair at which time Plaintiff accidentally saw Mr. Aviles' 6/9/2011 E Mail and obtained a copy of it.

37.    **On 6/14/2010 PLAINTIFF MAILED TO CHIEF AREA OFFICER, KALLAS, A RESPONSE TO MR. AVILES' 6/9/2010 E-MAIL . PLAINTIFF RESPONSE STATED: "HE KNEW OF ME, THAT I WAS NOT OF HIS ETHNICITY OR RELIGION BECAUSE I WAS ALWAYS ABSENT ON CERTAIN RELIGIOUS HOLIDAYS." "IT IS MY BELIEF THAT MR. AVILES ACTIONS TOWARD ME ARE DISCRIMINATORY." (Exhibit 25).**

38.    According to policy, the Chief Area Officer, Mr. Kallas, was required to submit the discrimination charge to the CPS discrimination department. It is believed that the CPS discrimination department sometimes does not act on some discrimination matters. Plaintiff has seen no record of the discrimination department being involved in this matter, and she has not been contacted by the CPS discrimination department or anyone else regarding to what she wrote..

39.    **THE BOARD HAS SPENT HUNDREDS OF THOUSANDS OF DOLLARS ON PAYMENTS OF DISCRIMINATION COMPLAINTS IN THE AREA IN WHICH PLAINTIFF WORKED. BUT, THE BOARD WOULD NOT TALK TO OR GIVE ANYTHING IN WRITING TO PLAINTIFF ABOUT THE TERMINATION OF HER EMPLOYMENT OR GIVE HER AN EXIT OR AN EMPLOYMENT INTERVIEW PERTAINING TO RE-EMPLOYMENT.**

40.    **BARRY SCHOOL'S PERFORMANCE WITH PLAINTIFF AS ITS PRINCIPAL STARTED LOW AS A RESULT OF THE SCHOOL BEING TAKEN OFF OF LIMITED ENROLLMENT AND BECOMING GROSSLY OVERCROWDED. IT THEN ROSE TO BE ONE OF THE BEST PERFORMING SCHOOLS IN THE CITY OF CHICAGO.**

41.    Barry Elementary School which had already been operating at full capacity was taken off of controlled (limited number of students) enrollment starting in July 2007 with the main registration and first classes starting in September 2007. Offices, and a storage room were turned into classrooms. One classroom had to have two grades sharing the same room. A couple of other classrooms were divided into two classrooms with a curtain partition. Sound from one part of the room would interfere with teaching in the other part of the room. Part of

11

the library was turned into an office. Classrooms that were planned for rooms in the same grade being next to each other (making it easier for teachers to plan together) had to be moved depending on the size of the room available. Approval had to be obtained for funds to hire additional staff. Then possible staff members had to be interviewed and hired.

42.    The number of students taking the major tests given students more than doubled in some grades compared with the years before. Many of the students were from different schools in the city, the state, and different countries. Most of the students did not have a good knowledge of English. Students had to be sorted out to determine what kind of classroom they would go into based on the amount of English they know and they would have to be tested and interviewed individually to obtain an accurate diagnosis in which room that they should be in. With a large number of new students that is not an easy and fast task. Then students had to be shifted from one classroom to another based upon that evaluation. That would cause disruptions and was not a good learning environment.

43.    The knowledge that students are taught is somewhat different in each school in a city, state, or country. Some students may be taught what they already know and others would not know what they would be expected to know if they were taught in the same school. Therefore they would not score as high on a test as if they stayed continuously at the same school.

44.    There were a number of factors that would affect the test scores that a school would receive over the years. There appeared to have been some errors in calculating scores. Barry School was improperly placed on probation as a result of not proper evaluation made of those factors. Some of those factors were discussed in the Chicago Public Schools Policy Manual pertaining to school performance and probation policy and could have resulted in the school not being on probation. Plaintiff gave her Chief Area Supervisor, Mr. Kallas, her immediate supervisor, reasons why the school having been placed on probation should be rescinded including some obvious errors and the overcrowded conditions that affected the school. Barry's scores if they were a little higher would not have been on probation. Mr. Kallas would not try to have that status changed or even have the obvious errors corrected.

12

45.     Errors that Plaintiff pointed out to Mr. Kallas were that the school received low scores in grade seven during the years 2008 and 2009.  However, the school did not have a seventh grade. **(Exhibits 26 & 27)**.  Mr. Kallas said that is minor and can be ignored.  Approximately one hundred schools were on probation.  Once on probation a school has to stay on probation for at least two years.  The probation status, based on the first year went into effect in the second year.  When that occurs, it is believed that the Area Office gets more money to spend.

46.         The school's performance during Plaintiff's second year as its Principal.

In Plaintiff's second year as principal of Barry School, its performance score went up approximately 17 per cent and was one point off of not being in the probation range and was subject to review as to whether the school should not be in the probation range.  Barry's Value – Added Math Score went up to be among the highest in Chicago and its Value-Added Reading Score was above average.  During the Review, Mr. Kallas could have recommended that Barry School be placed in the satisfactory range and succeeded.  However, in an evaluation rating, Mr. Kallas changed Plaintiff's performance rating from satisfactory to needs improvement. --.It appeared that Mr. Kallas did not like Aviles complaining about Plaintiff to top school system officials (including his boss) and to the community affairs officer and the Alderman even though it was proved that Mr. Aviles was making false statements and he saw the proof.

47.         The school's performance during Plaintiff's third year as Principal

In Plaintiff's third year as principal of Barry School, the school's score by one measure rose over fifty percent.  The school was given the Board's highest excellence performance level 1 rating, its Value-Added Reading Score was the highest of any school having 560 or more students; it was higher than all schools, regardless of size, supervised by Chief Area Officer Kallas; and it became the tenth highest ranking school in Chicago, regardless of size.  **(Exhibit 23_)**.  The school's Value-Added Math Score was among the highest in the City  and the LSC gave Plaintiff the highest rating of Exceeding the requirements of a principal. **(Exhibit 22)**. During that time Mr. Kallas was talking about firing Plaintiff because she was not a strong

13

enough leader and poor performance, and he fraudulently had Plaintiff's employment terminated by the Board. The termination went into effect two weeks after Aviles derogation of all LSC members that would participate in an LSC scheduled meeting to evaluate the principal and after Plaintiff's letter to him about discrimination. However, those two events occurred after Mr. Kallas having proceeded with what appeared to be his scheme to fraudulently have Plaintiff's employment terminated.

**48.    CHIEF EXECUTIVE OFFICER, JOSEPH KALLAS, SHORTLY BEFORE JANUARY 12, 2010 COERCED PLAINTIFF INTO SUBMITTING (A SO CALLED) RETIREMENT LETTER BY THREATING TO FIRE HER AND HAVE HER NAME DAMAGED BECAUSE HE WOULD BE TELLING THAT TO THE STAFF, THE LSC, AND THE PARENTS AND THAT IT WOULD GET INTO THE PAPERS, AND IT WOULD NOT BE NICE, AND IF SHE IS FIRED SHE WOULD LOSE HER PENSION.**

49.    During the above conversation, Mr. Kallas told her that she was not a strong enough leader and her schools test scores were not satisfactory. Plaintiff asked if she could leave in dignity and avoid the above by retiring at the end of the school year. He said yes and that she will have to send him a letter stating that she will retire at the end of the school year and that she would have to file the paperwork with the Retirement Department and the Pension Board as soon as possible for the retirement to be allowed. Plaintiff sent him a conditional retirement letter on January 12, 2010 **(Exhibit 28)** and he sent Plaintiff a response on January 13, 2010 stating that the retirement paperwork must be filed as soon as possible. This will be allowed provided paperwork is completed in a timely manner. **(Exhibit 29).**

50.    Plaintiff never submitted any paperwork required for retirement to be allowed by Mr. Kallas, the Chief Area Officer and Plaintiff is not receiving a retirement pension, which she should receive if she retired.

**51.        CHIEF AREA OFFICER JOE KALLAS AND PLAINTIFF ENTERED INTO A WRITTEN AGREEMENT THAT SHE WILL NOT RETIRE AT THE END OF THE THIRD YEAR OF HER EMPLOYMENT AS PRINCIPAL IF SHE DOES NOT SUBMIT THE RETIREMENT PAPER WORK AS SOON AS POSSIBLE. HE FALSIFIED THE AGREEMENT BY USING ONLY PART OF IT TO MAKE IT APPEAR THAT SHE AGREED TO RETIRE AND HE TERMINATED HER EMPLOYMENT.**

52- The above agreement, it is believed, was a contract in excess of a significant amount of money. A contract for that amount of money is required by Board rules to be approved by the Board's law department as to form and then submitted to the Board for approval. That was not done.

53- The Board's law department did see the first part of the above agreement that referred to retirement and which also stated: "that after our discussion and agreement". It is presumed that lawyers would want to know what was the agreement and is there any documentation that pertains to it. If they checked and got honest answers, this case would not be in court. If they got dishonest answers and therefore did nothing, then they would have probably received a note from the

54. CHIEF AREA OFFICER JOE KALLAS COERCED PLAINTIFF TO SUBMIT TO A CONDITIONAL AGREEMENT, SUPPORTED BY TWO WRITINGS, ALLOWING PLAIINTIFF TO RETIRE ONLY IF SHE COMPLETES PROPER RETIREMENT PAPERWORK AS SOON AS POSSIBLE.

55. The conditional agreement, is in effect a contract. It consisted of two pages that are the following:

  a) A one page writing by the Plaintiff, dated January 12, 2010 in which Plaintiff stated that after our discussion and agreement I am giving you notice that I will retire at the end of the 2009-2010 school year. I will prepare the school budget and the school improvement plan for your improvement and any modification that you may desire. I will continue with my administrative duties to keep the school running smoothly. .... (The school budget was for the following year and the school improvement plan was to be for the next two years)  in accordance with the agreement, she would retire at the end of the school year after she prepares the school budget (for the following year) and prepares the school improvement plan (for the following two years) and keep the school running smoothly.(Exhibit 28).

  b) A second page writing, written by Mr.Kallas dated the morning of the next day, January 13, 2010, stated : "Please remember that all CPS/CTPF paperwork should be completed as soon as possible. This will be allowed, without any further action, provided paperwork is completed in a timely manner." (EXHIBIT 29). The CPS/CTPF paperwork refers to filling out the Chicago Public Schools Human Capital retirement form and the Chicago Teachers Pension Fund retirement forms.

**56. BY JANUARY 15, 2010, ACCORDING TO THE RETIREMENT AGREEMENT THAT MR. KALLAS MADE WITH PLAINTIFF, HE WOULD NOT ALLOW PLAINTIFF TO RETIRE AT THE END OF THE SCHOOL YEAR SINCE PLAINTIFF DID NOT SUBMIT ANY RETIREMENT PAPERWORK AS SOON AS POSSIBLE. PLAINTIFF NEVER SUBMITTED ANY RETIREMENT PAPERWORK TO THE DEPARTMENTS HANDLING RETIREMENTS.**

57.    According to Mr. Kallas' stipulation in their agreement, if Plaintiff did not complete as soon as possible the submission of the retirement paperwork to the appropriate departments, Plaintiff's retirement at the end of the school year would not be allowed. Plaintiff never filled out any retirement paperwork and has not been given a retirement pension to which she would be bound to receive if she had retired. Two days would be much more than adequate time to have filled out the necessary retirement paperwork.

58.    On February 24, 2010, Mr. Kallas had Plaintiff to his office and said that he has not seen a copy of her retirement papers. Plaintiff said that she did not submit them and said that she believes that she is not retiring. Mr. Kallas then proceeded to tell her that is she does not retire, then he would have to proceed to have her fired and that he will be telling that to the staff, the LSC, and the parents, and it will get into the papers and that would not be to nice and that if she is fired she will lose her pension. Plaintiff said that she hopes that he did not do that. He said think about it. Plaintiff said she will and left.

59.    On the morning of February 25, 2010, Plaintiff mailed Kallas a certified letter stating that she is rescinding my previous letter's statement that she will retire at the end of the 2009-2010 school year. That she will continue to work for the good of Barry School.   Mr. Kallas received the letter on February 26, 2010. **(Exhibit 30).**   Plaintiff received a letter from Mr. Kallas stating "Per your letter dated January 12, 2010 (attached) your last day as principal of Barry Elementary School will be June 30, 2010. **(Exhibit 31).**

60.    On June 29, 2010, Plaintiff submitted a letter with exhibits to the CPS Chief Executive Officer, Ron Huberman, through his secretary. The letter basically said that there was no valid retirement and that if he does not accept that, she requests that she be rehired and gave the reasons for that. **(Exhibit 32)** with the above attached Exhibits.

61. The Board through its officers did not send Plaintiff any response to her letter to the Chief Executive Officer.

62.     On June 11, 2010, Plaintiff made a request to Mr. Ron Huberman, Chicago Public Schools (CPS) Chief Executive Officer, to see and request copies of her personnel files. After the termination of her employment with the CPS, She eventually received copies of part of her personnel files. Her January 12, 2010 letter was not in there,. nor was there anything pertaining to the termination of her employment.

63.     Near the end of that summer, Plaintiff went to the Human Resources Department's section where personnel records are kept and requested to see her records. The person who took the request called another person to look at her computer. That person said that she would get them. After 20 minutes or more she came back and showed Plaintiff the only thing that she found was a copy of Plaintiff's January 12, 2011 letter pertaining to retirement. That person did not know how it got there or the location of the rest of the file.


64.     The Office of Human Capital (which may also be called the Human Resources Department and similar names) and the retirement pension board have specific forms that they give to people who are retiring or resigning and which they have principals fill out when they retire or resign. Plaintiff has not filed out any form for retirement or resignation. Plaintiff has never brought any document or statement to the Office of Human Capital or Human Resources Department or to the pension office or department which stated that she is retiring or resigning.

65.     Plaintiff has submitted a statement to Chief Area Officer, J. Kallas, that she is not retiring, Mr. Kallas did not submit that to any Board office that handles retirements.

66.     Chief Area Officer, Kallas, may have sent part of an agreement to the Board's Office of Human Capital or Human Resources Department, but he did not send the whole agreement. The whole agreement required that all CPS/CT PF paperwork be completed as soon as possible for retirement to be allowed. Plaintiff did not complete any CPS/CTPF paperwork for retirement to be allowed.

67.     THE BOARD WOULD NOT GIVE PLAINTIFF INFORMATION ABOUT HER TERMINATION

( There was no response to it.  Plaintiff was given part of her personnel records after her

employment was terminated, but that and other important documents were not in it.

It appears that Defendant's discrimination department does not act properly on all the

discrimination charges before it.)

68.     Documents pertaining to the termination of Plaintiff's employment were not in the

Board's personnel file pertaining to her

69.     Plaintiff tried to speak to someone about the termination of her employment, but

nobody spoke to her.

70.     Plaintiff tried to get the Board to rehire her, but nobody spoke to her about it.

71.     Defendant has paid hundreds of thousands of dollars in payments to plaintiffs in

discrimination cases in the Area in which plaintiff had been employed.


72.     PLAINTIFF MET ALL OF THE BOARD'S LEGITIMATE EMPLOYMENT EXPECTATION DURING
        HER THIRD YEAR, AS SHOWN BY THE BOARD GIVING HER ITS HIGHEST EVALUATIONS

73.     Despite the Board giving plaintiff its highest evaluations (as shown below) at the end of

the third year of her four year contract, the Board terminated her employment at the end of

her third year.

74      Barry school had the highest value-added reading measurement performance of all

Chicago schools having 560 or more students).   The Value-added measurement compares the

performance of students having similar characteristics.

75.     Barry school had the tenth highest value-added reading performance of all Chicago

elementary schools regardless of size.

18

76.     Barry school had the highest Value-Added reading performance of all schools, regardless of size, supervised by her immediate supervisor, Mr. Joseph G. Kallas, Chief Area Officer (CAO) of Areas one and six.

77.     Barry school's Value- Added mathematics performance was among the highest in Chicago, although it was not among the top 15 schools.

78.     The Board rated Barry School's overall performance as Level 1 excellent performance, the highest rating.

79.     **THE BOARD CLASSIFIED ALL FOUR NEIGHBORING SCHOOLS AS HAVING LOWER PERFORMANCE RATINGS THAN BARRY SCHOOL AND NONE OF THEIR PRINCIPAL'S EMPLOYMENTS WERE TERMINATED DURING PLAINTIFF'S THIRD YEAR OF HER FOUR YEAR RENEWABLE EMPLOYMENT CONTRACT AT WHICH TIME IT TERMINATED PLAINTIFF'S EMPLOYMENT.**

80.     Monroe School, Reilly School, Reinberg School, and Scammon School all had lower Performance Policy Level ratings than Barry School. Monroe, Reilly, and Reinberg Schools all had Low Academic Standing ratings and they were all on probation and they all had below average value-added scores in reading and in mathematics. Scammon had been on probation the previous year. 15 of the 29 schools in Area 1 (My supervisor who had the title Chief Area Officer aupervised Area One and Area Six). Plaintiff's Value Added Reading performance was higher than all schools in Area One and Area Six. Plaintiff's Value-Added Math performance exceeded that of most schools in Area One.

81.     Monroe School and Reilly School had Hispanic principals and they were younger than plaintiff.

82.     It. Is believed that Reinberg School's principal was probably not Hispanic, but he was younger than plaintiff.

83.    Of particular interest is Monroe School in that Chief Area Officer Kallas told a meeting of

principals how he personally and his staff were working to raise the schools performance and

that he was going to give a talk to the Chief Executive Officer and I believe others about how he

was doing that.  Monroe School's performance got worse as measured by its Value-Added

scores and so did Reilly School's scores who Kallas and his team was trying to help.  Reinberg

School's scores stayed bad, although Kallas and his team was trying to help them.


84.    **THE HISPANIC, NOT JEWISH, SUBSTANTIALLY YOUNGER PRINCIPAL OF SABIN SCHOOL
       WHICH HAD VERY POOR PERFORMANCE WAS GIVEN PLAINTIFF'S JOB AS PRINCIPAL OF
       ONE OF THE BEST PERFORMING SCHOOLS IN CHICAGO WHEN THE EMPLOYMENT OF
       PLAINTIFF WAS TERMINATED AT THE END OF THE THIRD YEAR OF HER FOUR YEAR
       RENEWABLE EMPLOYMENT CONTRACT.  PLAINTIFF WAS SIGNIFICANTLY OLDER
       NOT HISPANIC, WAS JEWISH, CONTRARY TO THE PRINCIPAL WHO WAS GIVEN HER JOB**

85..    Nancy Adela Paulette was the principal of Sabin School during the third year of Plaintiff's four
year renewable employment contract as Principal of Barry School.
86.    Chief Area Officer of Areas One and Six, Mr. Joseph Kallas, was the immediate supervisor of both
principals.
87.    Mr. Kallas, without due process, replaced Plaintiff as principal of Barry with Ms. Paulette
effective July 1, 2010 and terminated Plaintiff's employment, it is believed fraudulently.

88.    For the last year that Ms. Paulette was principal of Sabin School the school had the Board's
lowest performance evaluation level  rating  and its Value-Added Reading Score was the next to the
lowest score of the 29 schools in Area Six.

89.    For that same year, Plaintiff's school had the Board's highest performance evaluation level
rating, had the highest Value-Added Reading Score of all schools having 560 or more students, had a
higher sValue-Adding Reading Score  than all approximately 58 schools in areas one and six, and was
tenth highest of all schools in the City of Chicago.  Its Value-Added Math Score was also high.
          During the preceding year, 2008-2009 Barru School's math scores were among the highest in
Chicago.
          And during Plaintiff's first year as Principal, when Barry School had been taken off of limited
enrollment and had become highly over crowded causing it serious problems, Sabin School had a lower
Value-Added Reading Score than Barry School.

          The Value-Added Scores compare student scores on their improvement over time for students
grouped into a combination of approximately ten combined characteristics including how often they
transfer between schools, whether they are homeless, low income levels, etc.

90.   For the year that Ms. Paulette became principal of Barry School, it Value-Added Scores in reading and math dropped, the school's Performance Policy Level Rating by the Board dropped, and the absentee rate dropped somewhat from the essentially constant level that it had been for many years.

## COUNT I: DISCRIMINATION IN TERMINATION OF EMPLOYMENT BASED ON RACE OR NOT BEING THE CORRECT NATIONAL ORIGIN (BASICALLY NOT BEING HISPANIC)

91.   Plaintiff realleges paragraphs 1 through 90 as though fully set forth herein.

91   . Defendant considers Hispanics to be a race and plaintiff to be white and whether it is just called not being Hispanic, plaintiff is therefore a member of a protected group.

92.   Chief Area Officer KALLAS had the authority to effectively recommend the firing of Plaintiff while she was employed by defendant at Barry School.

93.   As Chief Area Officer, Kallas was acting as agent for Defendant CHICAGO BOARD.

94.   As a member of the Local School Council, Edillberto Aviles was also acting an an agent of the CHICAGO Board.

95.   AVILES actions towards plaintiff were a result of plaintiff not being Hispanic and being Jewish and he wanted a Hispanic to be principal. He was complaining about plaintiff from the time that plaintiff was one of approximately 50 applicants for the position of principal of Barry School and he was complaining to 5 or 6 school system officials, the alderman, and to Mr. Kallas about plaintiff. These people would then phone Kallas to find out what was going on. Mr. Kallas told plaintiff that the (Hispanic) Alderman was calling him every day to get plaintiff fired and Mr. Kallas said that he was tired of all the calls.

96.   Mr. Kallas wanted a Hispanic who was not Jewish and substantially younger than Plaintiff to be principal and selected a Hispanic to replace the plaintiff who was not Hispanic and gave plaintiff's position to Nancy Paulette who was Hispanic and performance on the

Value-Added reading scores were very poor, while plaintiff's performance was among the highest in Chicago.   Mr. Kallas did not use Paulette to replace poor performing Hispanic principals .

97.     Plaintiff met all the defendant's legitimate employment expectations at the time of plaintiff's employment termination..

        **WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment against Defendant The Board of Education of the City of Chicago and if available, grant the plaintiff appropriate injunctive relief, lost wages, liquidated/ double damages, front pay, compensatory damages, punitive damages, prejudgment interest, post-judgment interest, and costs, including reasonable attorney fees and expert witnesses fees and any entitlement that she would have had if she had been employed by the Board including contributions to the Pension Fund.  And grant any further relief that this Court  deems just and appropriate.

## COUNT II: AGE DISCRIMINATION

98      Plaintiff realleges paragraphs 1 through 97 as though fully set forth herein.

99.     Plaintiff is over the age of 65 and is a member of the Age protected class.

100.    Defendant replaced Plaintiff as the principal of Barry school with a principal who was substantially younger and whose work performance was not as good.

101.    Defendant did not terminate other principals whose performance was poorer than plaintiff's but who were younger than plaintiff.

102.    Plaintiff met all the defendant's legitimate employment expectations at the time of plaintiff's employment termination..

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment against Defendant The Board of Education of the City of Chicago and if available, grant the plaintiff appropriate injunctive relief, lost wages, costs of entitlements if she was fully employed, liquidated/ double damages, front pay, compensatory damages, punitive damages, prejudgment interest, post-judgment interest, and costs, including reasonable attorney fees and expert witnesses fees . And grant any fur and any entitlement that she would have had if she had been employed by the Board including contributions to the Pension Fund. And any otherrelief that this Court deems just and appropriate.

## COUNT III RELIGIOUS DISCRIMINATION

103.    Plaintiff realleges paragraphs 1 through 102 as though fully set forth herein.

104.    Plaintiff is of the Jewish religion a protected discrimination class.

105.    Defendant terminated plaintiff's employment but did not terminate the employment of other principals that plaintiff's supervisor supervised and whose performance was not as good as that of plaintiff.

106.    Plaintiff met all the defendant's legitimate employment expectations at the time of Plaintiff's employment termination.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment against Defendant The Board of Education of the City of Chicago and if available, grant the plaintiff appropriate injunctive relief, lost wages, costs of entitlements as if she were fully employed iquidated/ double damages, front pay, compensatory damages, punitive damages, prejudgment interest, post-judgment interest, and costs, including reasonable attorney fees and expert

witnesses fees and any entitlement that she would have

had if she had been employed by the Board including contributions to the Pension Fund.   And

grant any further relief that this Court deems just and appropriate.

## COUNT IV:
### BREACH OF 4 YEAR RENEWABLE EMPLOYMENT CONTRACT WITHOUT DUE PROCESS

107.    Plaintiff realleges paragraphs 1 through 106 as though fully set forth herein.

108.    Plaintiff entered into a four year renewable employment contract with the Board of

Education of the City of Chicago (Board) in the year 2007 to be the Principal of John Barry

Elementary until June 30, 2011.

109.    Defendant terminated plaintiff's employment but did not terminate the

employment of other principals that plaintiff's supervisor supervised and whose

performance was not as good as that of plaintiff.

110.    Plaintiff met all the defendant's legitimate employment expectations at the time

of Plaintiff's employment termination.

111.    The Board terminated the Plaintiff's Employment Contract without due process as

required  by the Illinois School Code.

   **WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment against

Defendant The Board of Education of the City of Chicago and if available, grant the plaintiff

appropriate injunctive relief, lost wages, costs of entitlements as if she were fully employed

liquidated/ double damages, front pay, compensatory damages, punitive damages,

prejudgment interest, post-judgment interest, and costs, including reasonable attorney fees

and any entitlement that she would have

had if she had been employed by the Board including contributions to the Pension Fund and

any entitlement that she would have had if she had been employed by the Board including

contributions to the Pension Fund.   And grant any further relief that this Court deems just and

appropriate.

## COUNT V
## FRAUDULENT BREACH OF FOUR YEAR RENEWABLE EMPLOYMENT CONTRACT WITHOUT DUE PROCESS

112.    Plaintiff realleges paragraphs 1 through 111 as though fully set forth herein.

113.    Plaintiff entered into a four year renewable employment contract with the Board of

Education of the City of Chicago (Board) in the year 2007 to be the Principal of John Barry

Elementary School until June 30, 2011.

114.    Defendant terminated plaintiff's employment but did not terminate the employment of

other principals that plaintiff's supervisor supervised and whose performance was not as good

as that of plaintiff.

115.    Plaintiff met all the defendant's legitimate employment expectations at the time

of Plaintiff's employment termination.

116.    Plaintiff and Board's Chief Area Officer, Joseph Kallas entered into a contract, supported

by what Plaintiff wrote on January 12, 2010, in which she stated:

> "After our discussion and agreement, I am giving you notice that I will retire
> at the end of the 2009-2010 school year."

and Chief Area Officer, Joseph Kallas wrote on  January 13, 2010:

> "I received, via certified mail, your notice of retirement.  Please remember that all CPS/CTPF
> paperwork should be completed as soon as possible.  This will be allowed, without any

further action, provided paperwork is completed in a timely manner."

117.    CPS/CTPF paperwork referred to the Chicago Public Schools Human Capital Department, also known as Human Resources Department, retirement paperwork that a person fills out before retiring.  CTPF refers to the Chicago Teachers Pension Fund.

118.    Plaintiff did not fill out the CPS/CTPF paperwork as soon as possible which would be less than a day.  Plaintiff never filled out the CPS/CTPF retirement paperwork.  Mr. Kallas would have known this by Friday of that week by a phone call to the retirement departments.

119.    On February 24, 2010, Mr. Kallas requested that Plaintiff come to his office, at which time Plaintiff verbally told him that she believed that she would not retire.

120.    On February 25, 2010, Plaintiff mailed a letter to Mr. Kallas stating:  "I am rescinding my previous letter's statement that I will retire at the end of the 2009-2010 school year."  Mr. Kallas received the letter on February 26, 2010.

121.    After Plaintiff informed Mr. Kallas that she was not retiring, Mr. Kallas sent her a letter dated February 25, 2010 stating:  "Per your letter dated January 12, 2010 (attached) your last day as principal of Barry Elementary School will be June 30, 2010."  The Chief Area Officer's last letter to Plaintiff that if he did not just stop Plaintiff's salary and sent the January 12, 2010 part of their contractual agreement trying to make it appear as a valid agreement, then Mr. Kallas was committing fraud.  However, anyone receiving that January 12, 2010 letter would know that it was not a pure retirement letter, that it was a conditional letter; that it was made on the basis of an agreement and should have asked to see the terms of that agreement.  Whether or not Mr. Kallas just gave a verbal response to that question, they should have contacted the Plaintiff as to the terms of that agreement.  Such a letter as Mr. Kallas's would be highly unusual, according to Board policy after notifying a supervisor of retirement then a party should go to the retirement office and fill out the paperwork.  Mr. Kallas's last letter which if he forwarded it to someone would be highly suspicious, it being dated approximately two months after the date on the letter.  And the Board failed to follow due process in not proceeding with a proper investigation with that matter and personally including Plaintiff in that investigation.

123.    The Board terminated the Plaintiff's Employment Contract without due process as required  by the Illinois School Code.

   **WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment against Defendant The Board of Education of the City of Chicago and if available, grant the plaintiff appropriate injunctive relief, lost wages, costs of entitlements as if she were fully employed liquidated/ double damages, front pay, compensatory damages, punitive damages, prejudgment interest, post-judgment interest, and costs, including reasonable attorney fees and expert witnesses fees and any entitlement that she would have had if she had been  employed by the Board including contributions to the Pension Fund and any entitlement that she would have had if she had been employed by the Board including contributions to the Pension Fund and any entitlement that she would have  had if she had been employed by the Board including contributions to the Pension Fund.   And grant any furtherelief that this Court deems just and appropriate.

**COUNT VI**
**FAILURE TO ACT ON EVIDENCE THAT THERE WAS NO VALID NOTICE OF RETIREMENT; THAT THE BOARD IMPROPERLY TERMINATED PLAINTIFF'S EMPLOYMENT AND THAT ITS CHIEF AREA OFFICER IN EFFECT WAS FALSIFING RECORDS, AND DENIAL OF DUE PROCESS BY NOT CARRYING  THROUGH PROPER PROCEDURES TO RESOLVE THE ISSUES.**

124.    Plaintiff realleges paragraphs 1 through 123 as though fully set forth herein.

125.    Plaintiff entered into a four year renewable employment contract with the Board of Education of the City of Chicago (Board) in the year 2007 to be the Principal of John Barry Elementary School until June 30, 2011.

125       Defendant terminated plaintiff's employment but did not terminate the employment of other principals that plaintiff's supervisor supervised and whose

performance was not as good as that of plaintiff.

126.    Plaintiff met all the defendant's legitimate employment expectations at the time of Plaintiff's employment termination.

127.    The Board of Education of the City of Chicago ("Board") is acting as if Plaintiff has properly retired from her position of the principal of Barry School effective 6/30/2010.  On June 29, 2010, Plaintiff has submitted to the Board's Chief Executive Officer, Ron Huberman, evidence consisting of the contractual agreement between the Chief Area Officer and the Plaintiff which would show that there was no agreement that Plaintiff was to retire. Presumably a Chief Executive Officer would give that evidence to members of his staff and the Board's law department to determine the facts and recommend a solution.  There was no contact with the Plaintiff or issuing of a determination on the matter.  According to the Illinois School Code that is a violation of Due Process.

        **WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment against Defendant The Board of Education of the City of Chicago and if available, grant the plaintiff appropriate injunctive relief, lost wages, costs of entitlements as if she were fully employed liquidated/ double damages, front pay, compensatory damages, punitive damages, prejudgment interest, post-judgment interest, and costs, including reasonable attorney fees, and expert witnesses fees and any entitlement that she would have had if she had been employed by the Board including contributions to the Pension Fund and any entitlement that she would have had if she had been employed by the Board including contributions to the Pension Fund.   And grant any further relief that this Court deems just and appropriate.

### COUNT VII: NO INVESTIGATION OF PLAINTIFF'S DISCRIMINATION CHARGES BY THE BOARD'S DISCRIMINATION DEPARTMENT

128.    Plaintiff realleges paragraphs 1 through 127 as though fully set forth herein.

129.    Plaintiff entered into a four year renewable employment contract with the Board of

Education of the City of Chicago (Board) in the year 2007 to be the Principal of John Barry

Elementary School until June 30, 2011.

130.    Defendant terminated plaintiff's employment but did not terminate the

employment of other principals that plaintiff's supervisor supervised and whose

performance was not as good as that of plaintiff.

131.    Plaintiff met all the defendant's legitimate employment expectations at the time of

Plaintiff's employment termination.

132.    A factor in Plaintiff's employment being terminated was the continuous complaints by

Edilberto Aviles, who wanted the school to have a Hispanic principal. A number of Mr. Aviles

complaints were clearly proven clearly false. He would make complaints about Plaintiff to top

school system officials. Plaintiff stated to her supervisor, Mr. Kallas, the Chief Area Officer that

Mr. Aviles complaints about Plaintiff were discriminatory. Plaintiff stated that in writing in the

year 2008 and again on June 14, 2010. On June 9, 2010, Mr. Aviles, an LSC member, in writing

denounced all members of the LSC who would attend a scheduled LSC meeting on June 10,

2010 to vote on the performance evaluation rating of the principal that day. A copy of Mr.

Aviles statement was sent to Chief Area Officer Kallas. Plaintiff accidentally saw it, obtained a

copy, and responded to it and stated that It was discrimination. Mr. Kallas should have sent a

copy of Plaintiff's response to the discrimination department. Plaintiff did not hear anything

about her charge either from Mr. Kallas or the discrimination department. That was contrary to

the requirements of due process and alleged practices of the Board.

   **WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment against

Defendant The Board of Education of the City of Chicago and if available, grant the plaintiff

appropriate injunctive relief, lost wages, costs of entitlements as if she were fully employed

liquidated/ double damages, front pay, compensatory damages, punitive damages,

prejudgment interest, post-judgment interest, and costs, including reasonable attorney fees,

and expert witnesses fees and any entitlement that she would have had if she had been

employed by the Board including contributions to the Pension Fund and any entitlement that

she would have had if she had been employed by the Board including contributions to the

Pension Fund.   And grant any further relief that this Court deems just and appropriate.

## COUNT VIII: HARASSMENT

133.   Plaintiff realleges paragraphs 1 through 132 as though fully set forth herein.

134.   Local School Member Edilberto Aviles was harassing Plaintiff during her total
employment as a principal by the Board by making false charges against her and by trying to
build ill will against her causing the environment at which she worked to being unpleasant and
distressful.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment against

Defendant The Board of Education of the City of Chicago and if available, grant the plaintiff

appropriate injunctive relief, lost wages, costs of entitlements as if she were fully employed

liquidated/ double damages, front pay, compensatory damages, punitive damages,

prejudgment interest, post-judgment interest, and costs, including reasonable attorney fees,

and expert witnesses fees and any entitlement that she would have had if she had been

employed by the Board including contributions to the Pension Fund and any entitlement that

she would have had if she had been employed by the Board including contributions to the

Pension Fund.   And grant any further relief that this Court deems just and appropriate.

## COUNT IX
IMPRPOPER RATING OF PERFORMANCE AND KNOWINGLY MAKING FALSE STATEMENTS AND
COMMITTING FRAUD TO HAVE HER EMPLOYMENT TERMINATED WITHOUT DUE PROCESS

135.   Plaintiff realleges paragraphs 1 through 132 as though fully set forth herein.

136   Plaintiff believes that Chief Area Officer Joseph G. Kallas  has made false statements

pertaining to her and committed fraud to have her employment terminated without due process.

137. Mr. Kallas is an agent of the Board.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment against Defendant The Board of Education of the City of Chicago and if available, grant the plaintiff appropriate injunctive relief, lost wages, costs of entitlements as if she were fully employed liquidated/ double damages, front pay, compensatory damages, punitive damages, prejudgment interest, post-judgment interest, and costs, including reasonable attorney fees, and expert witnesses fees and any entitlement that she would have had if she had been employed by the Board including contributions to the Pension Fund and any entitlement that she would have had if she had been employed by the Board including contributions to the Pension Fund.  And grant any further relief that this Court deems just and appropriate.

## JURY DEMAND

Plaintiff demands a trial by jury of all issues in this action.

Dated this 28th day of November 2011.

Dated: _11/28/11_

By _Odette Langer_
Odette Langer

STATE OF ILLINOIS    )
                     ) SS
COUNTY OF COOK       )

<u>VERIFICATION</u>

Under the penalties as provided by law pursuant to 735 ILCS 5/8-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct to the best of her knowledge and belief, and as to such matters she certifies that she believes the facts stated herein to be true.

_Odette Langer_
Odette Langer

The foregoing document has been subscribed and affirmed, or sworn before me in the Cook County of Cook, State of Illinois, this _____ ___ day of _____ 2011.

_____

(official signature, seal, and commission expiration date of notary)

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
## INTAKE QUESTIONNAIRE

Please immediately complete this entire form and return it to the U.S. Equal Employment Opportunity Commission ("EEOC"). **REMEMBER**, a charge of employment discrimination must be filed within the time limits imposed by law, within 180 days or in some places within 300 days of the alleged discrimination. When we receive this form, we will review it to determine EEOC coverage. Answer all questions completely, and attach additional pages if needed to complete your responses. If you do not know the answer to a question, answer by stating "not known." If a question is not applicable, write "N/A." (PLEASE PRINT)

**1. Personal Information**

Last Name: _Langer_    First Name: _Odette_    MI: _____

Street or Mailing Address: _6429 N. Francisco_    Apt or Unit #: _2_

City: _Chicago_    County: _Cook_    State: _IL_    Zip: _60645_

Phone Numbers: Home: (___) _____    Work: (___) _____

Cell: (_773_) _473-0399_    Email Address: _____

Date of Birth: _3-21-45_    Sex: ☐ Male ☒ Female    Do You Have a Disability? ☐ Yes ☒ No

**Please answer each of the next three questions.** i. Are you Hispanic or Latino? ☐ Yes ☒ No

ii. What is your Race?   Please choose all that apply. ☐ American Indian or Alaskan Native   ☐ Asian   ☒ White
☐ Black or African American   ☐ Native Hawaiian or Other Pacific Islander

iii. What is your National Origin (country of origin or ancestry)? _Paris, France._

**Please Provide The Name Of A Person We Can Contact If We Are Unable To Reach You:**

Name: _____    Relationship: _____

Address: _____    City: _____    State: _____    Zip Code: _____

Home Phone: (___) _____    Other Phone: (___) _____

**2. I believe that I was discriminated against by the following organization(s):** (Check those that apply)

☒ Employer   ☐ Union   ☐ Employment Agency   ☐ Other (Please Specify) _____

**Organization Contact Information** (If the organization is an employer, provide the address where you actually worked. If you work from home, check here ☐ and provide the address of the office to which you reported.) **If more than one employer is involved, attach additional sheets.**

Organization Name: _Chicago Board of Education_

Address: _125 S. Clark St._    County: _Cook_

City: _Chicago_    State: _IL_ Zip: _60610_    Phone: (___) _____

Type of Business: _Education_    Job Location if different from Org. Address: _2828 N. Kilbourn_

Human Resources Director or Owner Name: _____    Phone: (___) _____

**Number of Employees in the Organization at All Locations:** Please Check (✓) One

☐ Fewer Than 15   ☐ 15 – 100   ☐ 101 – 200   ☐ 201 – 500   ☒ More than 500

**3. Your Employment Data** (Complete as many items as you are able.) Are you a federal employee? ☐ Yes ☒ No

Date Hired: _Jan. 1967_    Job Title At Hire: _Teacher_

Pay Rate When Hired: _$6000.00_    Last or Current Pay Rate: _$121,000_

Job Title at Time of Alleged Discrimination: _Principal_    Date Quit/Discharged: _June 30, 2010_

Name and Title of Immediate Supervisor: _Joseph Kallas_ _____

If Job Applicant, Date You Applied for Job _____    Job Title Applied For    **EXHIBIT 1**    _____

1

4. What is the reason (basis) for your claim of employment discrimination?

*FOR EXAMPLE, if you feel that you were treated worse than someone else because of race you should check the box next to Race. If you feel you were treated worse for several reasons, such as your sex, religion and national origin, you should check all that apply. If you complained about discrimination, participated in someone else's complaint, or filed a charge of discrimination, and a negative action was threatened or taken, you should check the box next to Retaliation.*

☒ Race ☐ Sex ☒ Age ☐ Disability ☒ National Origin ☒ Religion ☐ Retaliation ☐ Pregnancy ☐ Color (typically a difference in skin shade within the same race) ☐ Genetic Information; circle which type(s) of genetic information is involved: i. genetic testing   ii. family medical history   iii. genetic services (genetic services means counseling, education or testing)

If you checked color, religion or national origin, please specify: I am not Hispanic, I am of the Jewish religion

If you checked genetic information, how did the employer obtain the genetic information? _____

Other reason (basis) for discrimination (Explain): _____

5. What happened to you that you believe was discriminatory? Include the date(s) of harm, the action(s), and the name(s) and title(s) of the person(s) who you believe discriminated against you. Please attach additional pages if needed. (Example: 10/02/06 – Discharged by Mr. John Soto, Production Supervisor)

A. Date: 2010 ___ Action: Immediate supervisor threatened to file charges with the Chicago Public School in that State test scores had not gone up fast enough. (This was not true

Name and Title of Person(s) Responsible: Joseph Kallas.

B. Date: _____ Action: Threatened to have my name smeared and printed in the newspapers. (more info. to follow.)

Name and Title of Person(s) Responsible _____

6. Why do you believe these actions were discriminatory? Please attach additional pages if needed.

Pages to follow.

7. What reason(s) were given to you for the acts you consider discriminatory? By whom? His or Her Job Title?

Explanation to follow.
By Joseph Kallas - Area 1 instructional officer

8. Describe who was in the same or similar situation as you and how they were treated. For example, who else applied for the same job you did, who else had the same attendance record, or who else had the same performance? Provide the race, sex, age, national origin, religion, or disability of these individuals, if known, and if it relates to your claim of discrimination. For example, if your complaint alleges race discrimination, provide the race of each person; if it alleges sex discrimination, provide the sex of each person; and so on. Use additional sheets if needed.

Of the persons in the same or similar situation as you, who was treated *better* than you?

| Full Name | Race, Sex, Age, National Origin, Religion or Disability | Job Title | Description of Treatment |
|---|---|---|---|
| A. | | | |
| | | | |
| B. | | | |
| | | | |

Of the persons in the same or similar situation as you, who was treated *worse* than you?

| Full Name | Race, Sex, Age, National Origin, Religion or Disability | Job Title | Description of Treatment |
|---|---|---|---|

A. _____

_____

B. _____

_____

Of the persons in the same or similar situation as you, who was treated the *same* as you?

| Full Name | Race, Sex, Age, National Origin, Religion or Disability | Job Title | Description of Treatment |
|---|---|---|---|

A. _____

_____

B. _____

_____

**Answer questions 9-12 <u>only</u> if you are claiming discrimination based on disability. If not, skip to question 13. Please tell us if you have more than one disability. Please add additional pages if needed.**

9. Please check all that apply:

☐ Yes, I have a disability
☐ I do not have a disability now but I did have one
☐ No disability but the organization treats me as if I am disabled

**10. What is the disability that you believe is the reason for the adverse action taken against you? Does this disability prevent or limit you from doing anything? (e.g., lifting, sleeping, breathing, walking, caring for yourself, working, etc.).**

_____

_____

**11. Do you use medications, medical equipment or anything else to lessen or eliminate the symptoms of your disability?**
☐ Yes ☐ No

If "Yes," what medication, medical equipment or other assistance do you use?

_____

_____

**12. Did you ask your employer for any changes or assistance to do your job because of your disability?**
☐ Yes ☐ No

If "Yes," when did you ask? _____ How did you ask (verbally or in writing)? _____

Who did you ask? (Provide full name and job title of person)

_____

Describe the changes or assistance that you asked for: _____

_____

_____

How did your employer respond to your request? _____

_____

3

13. Are there any witnesses to the alleged discriminatory incidents? If yes, please identify them below and tell us what they will say. (Please attach additional pages if needed to complete your response)

| Full Name | Job Title | Address & Phone Number | What do you believe this person will tell us? |
|---|---|---|---|

A. _____

_____

B. _____

_____

14. Have you filed a charge previously on this matter with the EEOC or another agency?  ☐ Yes  ☒ No

15. If you filed a complaint with another agency, provide the name of agency and the date of filing: _____

_____

16. Have you sought help about this situation from a union, an attorney, or any other source?  ☐ Yes  ☐ No
Provide name of organization, name of person you spoke with and date of contact. Results, if any?

_____

**Please check one of the boxes below to tell us what you would like us to do with the information you are providing on this questionnaire.** If you would like to file a charge of job discrimination, you must do so either within 180 days from the day you knew about the discrimination, or within 300 days from the day you knew about the discrimination if the employer is located in a place where a state or local government agency enforces laws similar to the EEOC's laws. If you do not file a charge of discrimination within the time limits, you will lose your rights. If you would like more information before filing a charge or you have concerns about EEOC's notifying the employer, union, or employment agency about your charge, you may wish to check Box 1. If you want to file a charge, you should check Box 2.

BOX 1 ☐ I want to talk to an EEOC employee before deciding whether to file a charge. I understand that by checking this box, I have not filed a charge with the EEOC. I also understand that I could lose my rights if I do not file a charge in time.

BOX 2 ☒ I want to file a charge of discrimination, and I authorize the EEOC to look into the discrimination I described above. I understand that the EEOC must give the employer, union, or employment agency that I accuse of discrimination information about the charge, including my name. I also understand that the EEOC can only accept charges of job discrimination based on race, color, religion, sex, national origin, disability, age, genetic information, or retaliation for opposing discrimination.

_Colette Linger_
Signature

4-12-11
Today's Date

PRIVACY ACT STATEMENT: This form is covered by the Privacy Act of 1974: Public Law 93-579. Authority for requesting personal data and the uses thereof are:

1) FORM NUMBER/TITLE/DATE. EEOC Intake Questionnaire (9/20/08). 2) AUTHORITY. 42 U.S.C. § 2000e-5(b), 29 U.S.C. § 211, 29 U.S.C. § 626. 42 U.S.C. 12117(a)

3) PRINCIPAL PURPOSE. The purpose of this questionnaire is to solicit information about claims of employment discrimination, determine whether the EEOC has jurisdiction over those claims, and provide charge filing counseling, as appropriate. Consistent with 29 CFR 1601.12(b) and 29 CFR 1626.8(c), this questionnaire may serve as a charge if it meets the elements of a charge. 4) ROUTINE USES. EEOC may disclose information from this form to other state, local and federal agencies as appropriate or necessary to carry out the Commission's functions, or if EEOC becomes aware of a civil or criminal law violation. EEOC may also disclose information to respondents in litigation, to congressional offices in response to inquiries from parties to the charge, to disciplinary committees investigating complaints against attorneys representing the parties to the charge, or to federal agencies inquiring about hiring or security clearance matters. 5) WHETHER DISCLOSURE IS MANDATORY OR VOLUNTARY AND EFFECT ON INDIVIDUAL FOR NOT PROVIDING INFORMATION. Providing this information is voluntary but the failure to do so may hamper the Commission's investigation of a charge. It is not mandatory that this form be used to provide the requested information.

Rough Draft

EEOC BASIS 2 Draft 4-18-2011

## DISCRIMINATION

This case pertains to Odette Langer, who was Principal of Barry Elementary School in Chicago. The school was one of the highest performing Chicago Public Schools (CPS) operated by the Chicago Board of Education (Board) based on its standards. Her employment was terminated directly by her immediate Supervisor Joseph G.Kallas, Chief Area Officer of Areas l and 6, on June 30, 2010, at the end of three years of her four years renewable contract. (Barry School was in Area 1. Mr. Kallas supervised the 58 schools with each Area having 29 schools. He earlier had the title of Chief Instructional Officer of Area 1.) It is believed that he had never terminated a Principal other than Ms. Langer. He may have caused a Black Principal to resign. It is believed that no Principal had ever been terminated that had Ms. Langer's school's Value-added performance scores during her last year of employment based on the schools performance.

It is believed that Ms. Langer's employment termination was due to employment discrimination. The Board is expected to say that she voluntarily retired, although she had not filled out any of the paperwork required for retirement and she is not collecting a pension that goes with retirement. She did submit, to her supervisor, who threatened to smear her name, a coerced retirement letter. He wrote in reply on January 13, 2010, the day that he received the letter. "Please remember that all CPS/CTPS paper work should be completed as soon as possible. This will be allowed without any further action, provided paperwork is completed in a timely manner." Ms. Langer, never filled out any of the paperwork which would include the CPS's "Office of Human Capital" form that should be filled out for retirement. She later told Mr. Kallas that she was rescinding her previous letter's statement that she will retire at the end of the school year and followed it up with a letter stating so. He replied back near the end of March : " Per your letter, your last day as principal of Barry Elementary School will be June 30, 2010." The Board rules are that a notice of retirement can be withdrawn, if it is rescinded prior to their receiving it. It is believed that Mr. Kallas' sending the Human Capital Department was not received by that department prior to Mr. Kallas having received Ms. Langer's certified, dated as received, mail prior to that department having received what Mr. Kallas them , which was only the letter and not any form filled out.

At the time of Ms. Langer's termination, she was a white, Jewish, 65 years old (born 3/21/45), non-Hispanic person (born in France). Prior to becoming Principal, she was an Assistant Principal, who on her own time, after regular school hours, taught English to parents who were mostly Spanish, some of whom could not speak any English.

Mr. Kallas replaced Ms. Langer, on the day of her termination with Ms. _____ Paulette, who had immediately prior to that time been Principal of Sabin Elementary School, it is believed for only one year. Ms. Paulett was Hispanic, not Jewish, and a little more than 40 years of age.

Rough Draft

Sabin's school performance, based on Value-added performance, was rated below average in reading and above average in math compared to that of all other Chicago Public Schools.. Ms. Langer's Barry school's performance was rated among the highest for Chicago Public Schools in both reading and math for the year prior to her termination.

Ms. Langer's school's performance during the year prior to her termination was rated by the Board as one of the highest in Chicago and also the Local School Council gave her a very high rating. She received:

a) A "Performance Policy Level 1" rating.

The Board classified that as "Excellent" performance. It was the top of three ratings in that category. The three other schools located near Barry, and which were on a same school map were Monroe, Reilly, and Scammon. They had ratings of 3, 3, and 2 respectively. Fifteen schools in Area 1 and sixteen schools in Area 6 had the lower ratings. The rating was primarily based on the trend of a school's Illinois Student Achievement Tests (ISAT) scores over a period of four years, so the trend would include the improvement over one year prior to Langer becoming Principal.

b) A "Value Added" performance scores in Reading and Math that were among the highest of all schools in Chicago."

The "Value Added" metric made comparisons of each child's test performance improvement with that of the child's previous year. It took into account comparing children of similar characteristics. It considered similar characteristics that included their ability to speak English, how often they changed schools, if they were homeless, if they were getting free or reduced cost meals, if they were learning disabled, etc.

c) An evaluation made by Barry School's Local School Council, in evaluating many performance factors, rated her performance as exceeding the expectations required of a principal.

Ms. Langer had worked for the Board for more than 40 years.

She started as a teacher where she became Team Leader and in charge of a school's math program. While she was a teacher the Board's Central Office also used her part time after school to write Mathematics Programs for all elementary schools and during the summers had her give talks to 20 to 30 schools on the program and handle their math needs.

She then advanced to become an Assistant Principal for __ 20 years where she received Superior ratings and exceeded the maximum number of points ordinarily given for top performance because she was also doing part of the work of a principal.

After the previous principal of the school retired, Ms. Langer, one of approximately 50 applicants that applied for the position, was hired to become Principal.

2.

EEOC Form 161 (11/09)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### DISMISSAL AND NOTICE OF RIGHTS

| | |
|---|---|
| To: **Odette Langer**<br>6429 North Francisco<br>Apt. 2<br>Chicago, IL 60645 | From: **Chicago District Office**<br>500 West Madison St<br>Suite 2000<br>Chicago, IL 60661 |

**CERTIFIED MAIL 7011 0110 0001 8769 9999 CP**

☐ *On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 440-2011-03349 | **Cristina Wodka,**<br>**Investigator** | **(312) 869-8096** |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

☐ The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐ Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

☐ The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐ Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

☒ The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

☐ The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☐ Other *(briefly state)*

### - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

_____    4-27-11

Enclosures(s)

**John P. Rowe,**
**District Director**

*(Date Mailed)*

cc:

**CHICAGO BOARD OF EDUCATION**
**CITY OF CHICAGO**

## EXHIBIT 2



CHICAGO PUBLIC SCHOOLS

**Armando M. Almendarez**
Deputy Chief Education Officer

May 30, 2002

Ms. Odette Langer
Assistant Principal
Barry Elementary School
2828 N. Kilbourn
Chicago, IL 60641
Mail Run 31

Dear Ms. Langer:

I am writing to congratulate you as a recipient of the Chicago Principals &
Administrators Association's 2002 Outstanding Leadership Award. It serves as a
validation of all your efforts for your school community and is much-deserved.

I wish you every success in the future and look forward to applauding your achievement
at the Fairmont Hotel on June 7th.

Best wishes,

Armando M. Almendarez
Deputy Chief Education Officer

AMA:jl

cc: LSC Chairperson

**EXHIBIT 3**



**CHICAGO PUBLIC SCHOOLS**

Office of Academic Enhancement · 125 South Clark Street, 9th Floor · Chicago, Illinois 60603
Telephone 773/553-2060 · FAX 773/553-2061

Jack Harnedy
Officer

May 28, 2002

Ms. Odette Langer
Assistant Principal
Barry Elementary School

Dear Ms. Langer:

    Congratulations on being named one of this year's Outstanding Leadership Award recipients.

    It is always personally and professionally gratifying to be honored for excellence in one's career, particularly in a field as rewarding as education. I am certain that your Local School Council, colleagues, and the entire Barry school community join me in expressing pride in your achievement.

    We wish you continued success in your professional endeavors.

Sincerely,

Jack Harnedy
Officer

JH:kbh

**EXHIBIT 4**

*Children First*

# illinois
Certification Testing System

EXAMINEE SCORE REPORT

**Report 1 of 1**

Examinee #: 927-47-7
SSN: 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
Test Date: 01/13/90

**REFAKING THE TEST(S)**

* You may retake the test as many times as you wish. Registration bulletins and your Guides are available from departments of education at Illinois colleges and universities, Regional Superintendents of Schools, and the Illinois State Board of Education.

**APPLYING FOR CERTIFICATION**

* To obtain your Illinois teaching certificate you must apply through the Regional Superintendent of Schools. Applicants holding out-of-state certificates should obtain an application from the Illinois State Board of Education (ISBE). Certification and Placement Section, or from a Regional Superintendent of Schools. Passing the Basic Skills and appropriate subject-matter knowledge tests is one component of certification. Candidates also must complete all required course-work in an approved teacher education program and the field and clinical experience requirements. Certificates are issued when all requirements have been met and the appropriate documents filed with the ISBE. Direct questions concerning certification to the Illinois State Board of Education, Certification and Placement Section, 100 North First Street, Springfield, IL 62777, (217) 782-2805.

---

**Test:** 21 Superintendent    **Total Score:** 70    **Status:** Pass

| NUMBER OF ITEMS | SUBAREA NAME | SUBAREA SCORE |
|---|---|---|
| 11 to 20 | Educational Leadership and Public Policy | 59 |
| 21 to 30 | Public School Management | 59 |
| 21 to 30 | Personnel Administration | 72 |
| 21 to 30 | Educational Planning | 80 |
| 21 to 30 | School Governance and Student Affairs | 76 |
| | TOTAL SCORE | 70 |

PERFORMANCE GRAPH
0---------70---100

---

**Test:** 96 Basic Skills    **Total Score:** N/A    **Status:** Pass

| NUMBER OF ITEMS | SUBAREA NAME | YOUR SCORE | PASS |
|---|---|---|---|
| 51 or more | Grammar | 88 | YES |
| 31 or more | Reading | 93 | YES |
| 31 or more | Mathematics | 82 | YES |
| essay | Writing | 80 | YES |

PERFORMANCE GRAPH
0---------70---100

Obj./feature Number:   Reading  Mathematics  Writing
1 2 3 4 5 6 7 8  9 10 11 12 13 14 15  16 17 18 19 20 21 22  1 2 3 4
Obj./features not mastered:

L-0015-927647?
ODETTE
LANGER
4510 N MOZART STREET
CHICAGO          IL 60645

*Note: Pass/Did not pass status for the subject-matter test is based on the TOTAL score for each test. To pass the Basic Skills test, you must achieve a passing score in each of the four subareas of the test. See the back of this score report for an explanation of how to read your score report.

**EXHIBIT 5**

T. Per.
90
1987

CHICAGO PUBLIC SCHOOLS Case: 1:11-cv-05226 Document #: 8 Filed: 11/29/11 Page 43 of 105 PageID #:114 Bureau of Teacher Personnel

## TEACHER EVALUATION REVIEW
### (Required)

Sch Yr _____ 1986 _____ - _____ 1987

Name ___ **LANGER** _____ O. ___  SS# ___ **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** _____

School ___ **TRUTH** _____  Unit No. ___ **7900** ___ Dist. ___ **03** ___ Grade/Subj. _ _I M I P_

Date of Visitation/Observation

_____ 6-3-87 _____

Date of Follow-up Conference

_____ 6-3-87 _____

_____  _____

**A.** Strengths (Indicate how identified and supporting reasons. If additional space is needed, please use other side.)

*Conducts the IMIP program working effectively and efficiently with teachers, students, individuals... throughout the ... the ... program with ... and consistency to any task. ... curriculum in mathematics*

**B.** Weaknesses (Indicate how identified and supporting reasons. If additional space is needed, please use other side.)

**C.** Evaluation (Superior, Excellent, Satisfactory, or Unsatisfactory.)

→ | *Superior* |

I have received a copy. My signature does not indicate that I agree or disagree with the contents.

(Signed) __ *Odelle Langer* __ 6-11-87

Teacher · Date Received

(Signed) __ *Eleanor Antill* __ 6-9-87

Evaluator · Date

Original shall be submitted to the teacher in accordance with the provisions of Article 39 of the Agreement between the Board of Education and the Chicago Teachers Union.

First copy: Principal's file.
Second copy: Bureau of Teacher Personnel.

**EXHIBIT 6**

_____

ORIGINAL: TEACHER

### TEACHER EVALUATION REVIEW
(Required)

Sch Yr ___1987___ – ___1988___

Name _**ODETTE LANGER**_____ SS# __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____

School **TRUTH**_____ Unit No. **7900** Dist. **03** Grade/Subj _DMIR Teacher_

Date of Visitation/Observation

_6-10-88_

Date of Follow-up Conference

_6-10-88_

---

A.   Strengths  (Indicate how identified and supporting reasons. If additional space is needed, please use other side.)

Identified through observation:

1. Utilize excellent strategies to facilitate the Math Program.

2. Works in a professional manner with administration, teachers and parents to accomplish goals.

B.   Weaknesses  (Indicate how identified and supporting reasons.  If additional space is needed, please use other side.)

None

C.   Evaluation  (Superior, Excellent, Satisfactory, or Unsatisfactory.)

→   | Superior |

I have received a copy. My signature does not indicate that I agree or disagree with the contents.

(Signed) _Odette Langer_     _6/24/88_
         Teacher                        Date Received

(Signed) _Elaine Cantrell_   _6-24-88_
         Evaluator                      Date

Original shall be submitted to the teacher in accordance with the provisions of Article 39 of the Agreement between the Board of Education and the Chicago Teachers Union.

First copy:   Principal's file.
Second copy:  Bureau of Teacher Personnel.         **EXHIBIT 7**

ORIGINAL: TEACHER

Chicago Public Schools

**Assistant Principal Performance Evaluation**

Assistant Principal _Odette Langer_  School _Barry_

Evaluator _Alice B. Vila._  Region _2_

Title _Principal_  # of Years as Assistant Principal _11_

Conference Date _9/26/00_  Evaluation Period _1999-2000_

## ASSISTANT PRINCIPAL PERFORMANCE SUMMARY

Mark the standard that BEST describes the performance of the assistant principal; then give an overall performance rating. For those areas not being evaluated, mark "N/A" (Not Applicable). For those areas being rated, the rating scale is as follows:

| | | |
|---|---|---|
| Exceeds | - | 2 points |
| Meets | - | 1 point |
| Does Not Meet | - | 0 points |
| N/A | - | 0 points |

### ADMINISTRATIVE CRITERIA

| I. INSTRUCTIONAL LEADERSHIP | EXCEEDS 2 | MEETS 1 | DOES NOT MEET 0 | N/A 0 |
|---|---|---|---|---|
| Assists with the improvement of test scores | 2 | | | |
| Assists in the evaluation of instructional staff, teaching faculty, and support personnel | 2 | | | |
| Assists in the implementation of the SIPAAA or CAP | | 1 | | |
| Engages in effective teaching strategies | | | | NA |
| Models effective instructional practices | 2 | | | |
| Assists in the development of the school budget | | 1 | | |

SUBTOTAL  8

| II. STUDENT-CENTERED LEARNING ENVIRONMENT | EXCEEDS 2 | MEETS 1 | DOES NOT MEET 0 | N/A 0 |
|---|---|---|---|---|
| Assists in the improvement of attendance | 2 | | | |
| Assists in the improvement of the retention rate | | 1 | | |
| Assists in the improvement of the dropout rate (HIGH SCHOOL) | | | | NA |
| Assists in the improvement of the graduation rate (HIGH SCHOOL) | | | | NA |
| Supports the school dress code | 2 | | | |
| Appearance and demeanor reflects professionalism | 2 | | | |
| Promotes students' self worth/positive development/involvement | 2 | | | |
| Promotes a safe school environment | 2 | | | |

**EXHIBIT 8**

SUBTOTAL  11

| III. PROFESSIONAL GROWTH AND DEVELOPMENT | EXCEEDS 2 | MEETS 1 | DOES NOT MEET 0 | N/A 0 |
|---|---|---|---|---|
| Assists with the professional growth and development of staff | 2 | | | |
| Engages in professional growth and development of self | 2 | | | |

SUBTOTAL  **4**

| IV. SCHOOL LEADERSHIP (MANAGEMENT) | EXCEEDS 2 | MEETS 1 | DOES NOT MEET 0 | N/A 0 |
|---|---|---|---|---|
| Assists in the maintenance of a professional environment | ■ | 1 | | |
| Assists in the compliance with Board rules, policies, procedures, existing laws, and agreements | ■ | 1 | | |
| Demonstrates necessary organizational skills | 2 | | | |
| Demonstrates sound and professional judgment | ■ | 1 | | |
| Communicates and demonstrates interpersonal skills with faculty members, staff, students and community | 2 | | | |
| Assists the principal in a timely manner with administrative functions and any other duties as deemed necessary | 2 | | | |
| Local Criteria: (# of points assigned is at the principal's discretion) Organizes + supervises after-school & summer school programs | 2 | | | |

SUBTOTAL  **11**

| V. TEACHER, PARENT AND COMMUNITY INVOLVEMENT | EXCEEDS 2 | MEETS 1 | DOES NOT MEET 0 | N/A 0 |
|---|---|---|---|---|
| Communicates the school curriculum and student achievement | 2 | | | |
| Demonstrates a sensitivity to parents and community | 2 | | | |
| Uses appropriate human relations strategies to promote school/community partnerships | 2 | | | |

SUBTOTAL  **6**

| Rating Scale: | Exceeds | 91% or more of possible total points |
| | Meets | 75% to 90% of possible total points |
| | Does Not Meet | 74% or less of possible total points |

| Rating Range: | Teaching Assistant | Freed Assistant |
| --- | --- | --- |
| Exceeds | 33 - 36 | 37 - 41 |
| Meets | 27 - 32 | 31 - 36 |
| Does Not Meet | 0  - 26 | 0 - 30 |

TOTAL POINTS: 40

RATING: Exceeds

**Comments: (Optional)**

Ms. Langer has provided strong leadership
and demonstrated excellent organizational/
management skills.

EVALUATOR'S SIGNATURE _Alice Blula_  DATE 9/26/00

ASSISTANT PRINCIPAL'S SIGNATURE _Odette Langer_  DATE 9/28/00

*The Assistant Principal's signature indicates only that this Performance Summary was received. It does not indicate agreement or disagreement with the contents of the summary.*

**\*Evaluator must complete the "Assistant Principal Performance Narrative" for any focus area in which the Assistant Principal performance _DOES NOT MEET_ the standards and expectations necessary to support academic achievement.**

## ASSISTANT PRINCIPAL PERFORMANCE NARRATIVE

| Focus Areas In Which Performance Needs Improvement* | Evaluator's Comment(s) | Assistant Principal's Comment(s) |
|---|---|---|
| NA | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

EVALUATOR'S SIGNATURE _____ DATE: 9/28/00

ASSISTANT PRINCIPAL'S SIGNATURE _____ DATE: 9/28/00

*The Assistant Principal's signature indicates only that this Performance Summary was received. It does not indicate agreement or disagreement with the contents of the summary.*

**\*As indicated in the Assistant Principal's Performance Summary**

Page 1 of 4

## Chicago Public Schools
### Assistant Principal Performance Evaluation 2001- 2002

Assistant Principal _Odette Igngr_    School _Denny_

Evaluator _Alice B Vila_    Region _Area 1_

Title _Principal_    No. of Years as Assistant Principal _13_

Conference Date _Sept 17, 2002_    Evaluation Period _2001_ to _2002_

---

### ASSISTANT PRINCIPAL PERFORMANCE SUMMARY

Mark the standard that BEST describes the performance of the assistant principal; then give an overall performance rating. For those areas not being evaluated, mark "N/A" (Not Applicable). For those areas being rated, the rating scale is as follows:

| Exceeds | Meets | Does Not Meet | Not Applicable (N/A) |
|---|---|---|---|
| 2 | 1 | 0 | 0 |

| | ADMINISTRATIVE CRITERIA | | | | |
|---|---|---|---|---|---|
| | **I. INSTRUCTIONAL LEADERSHIP** | EXCEEDS | MEETS | DOES NOT MEET | N/A |
| | | 2 | 1 | 0 | 0 |
| 1 | Assists with the improvement of test scores | 2 | | | |
| 2 | Assists in the evaluation of instructional staff, teaching faculty, and support personnel | 2 | | | |
| 3 | Assists in the implementation of the SIPAAA or CAP | ▓ | 1 | | |
| 4 | Engages in effective teaching strategies | 2 | | | |
| 5 | Models effective instructional practices | 2 | | | |
| 6 | Assists in the development of the school budget | ▓ | | | |

COLUMN TOTALS

AREA I TOTAL     9

| | **II. STUDENT-CENTERED LEARNING ENVIRONMENT** | EXCEEDS | MEETS | DOES NOT MEET | N/A |
|---|---|---|---|---|---|
| | | 2 | 1 | 0 | 0 |
| 7 | Assists in the improvement of attendance | 2 | | | |
| 8 | Assists in the improvement of the retention rate | ▓ | 1 | | |
| 9 | Assists in the improvement of the dropout rate (HIGH SCHOOL) | | | | C |
| 10 | Assists in the improvement of the graduation rate (HIGH SCHOOL) | | | | C |
| 11 | Supports the school dress code | 2 | | | |
| 12 | Appearance and demeanor reflects professionalism | 2 | | | |
| 13 | Promotes students' self worth/positive development/involvement | 2 | | | |
| 14 | Promotes a safe school environment | 2 | | | |

**EXHIBIT 9**

COLUMN TOTALS

AREA II - TOTAL     11

Page 3 of 4

| Rating | Elementary Assistant Principal | High School Assistant Principal | Criteria |
|---|---|---|---|
| Exceeds | 37 - 40 | 40 - 44 | 92% or more of possible total points |
| Meets | 30 - 36 | 33 - 39 | 75% to 91% of possible total points |
| Does Not Meet | 0 - 29 | 0 - 32 | 74% or less of possible total points |

TOTAL POINTS: 41

RATING: Exceeds

**Comments: (Optional)**

Colette Langer has demonstrated very strong organizational + managerial skills. She has provided competent leadership in the area of language arts. Her efforts + willingness "to go the extra mile" enhance all aspects of the instructional + extra-curricular programs at Barry.

Evaluator's Signature _____ DATE 9/27/02

Assistant Principal's Signature _Colette Langer_ DATE 9/27/02

*The Assistant Principal's signature indicates only that this Performance Summary was received. It does not indicate agreement or disagreement with the contents of the summary.*

**\*Evaluator must complete the "Assistant Principal Performance Narrative" for any focus area in which the Assistant Principal performance _DOES NOT MEET_ the standards and expectations necessary to support academic achievement.**

- Original should be mailed by Friday, September 27, 2002 to:
  Mary Wojdyla, Human Resources
  125 S. Clark Street, 2nd Floor
  Chicago, IL 60603
  Mail Run #125
- Copies to: School and Assistant Principal

# CHICAGO PUBLIC SCHOOLS
## OFFICE OF INSTRUCTION AND SCHOOL MANAGEMENT
## ASSISTANT PRINCIPAL PERFORMANCE EVALUATION

Assistant Principal: Odette Lancer          School: Benny

Evaluator: Alus B. Vilet          Cluster: 1

Title: Principal          # Years as Assistant Principal: 15

Conference Date: 9/30/04          Evaluation Period: 2003-2004

## Assistant Principal Performance Summary:

Mark the standard that BEST describes the performance of the assistant principal then give an overall performance rating
For those areas not being evaluated, mark "N/A" (Not Applicable). For those areas being rated, the rating scale is:

**Exceeds – 2 points**          **Meets – 1 point**          **Does Not Meet – No points**

| | ADMINISTRATIVE CRITERIA | Exceeds | Meets | Does Not Meet | N/A |
|---|---|---|---|---|---|
| I. INSTRUCTIONAL LEADERSHIP | Assists with the improvement of test scores | 2 | | | |
| | Assists in the evaluation of instructional staff, teaching faculty, and support personnel | 2 | | | |
| | Assists in the implementation of the SIPAAA or CAP | | 1 | | |
| | Engages in effective teaching strategies | 2 | | | |
| | Models effective instructional practices | 2 | | | |
| | Assists in the development of the school budget | | 1 | | |
| | Organizes, conducts, and evaluates staff development activities | 2 | | | |

Subtotal: 11

| | ADMINISTRATIVE CRITERIA | Exceeds | Meets | Does Not Meet | N/A |
|---|---|---|---|---|---|
| II. STUDENT-CENTERED LEARNING ENVIRONMENT | Assists in the improvement of attendance | 2 | | | |
| | Assists in the improvement of the retention rate | | 1 | | |
| | Assists in the improvement of the dropout rate (H.S.) | | | | O |
| | Assists in the improvement of the graduation rate (H.S.) | | | | O |
| | Supports the school dress code | 2 | | | |
| | Appearance and demeanor reflects professionalism | 2 | | | |
| | Promotes students' self-worth/positive development/involvement | 2 | | | |
| | Promotes a safe school environment | 2 | | | |
| | Assures the consistent and effective implementation of UDC | 2 | | | |

Subtotal: 13

| III. PROFESSIONAL GROWTH AND DEVELOPMENT | ADMINISTRATIVE CRITERIA | Exceeds | Meets | Does Not Meet | N/A |
|---|---|---|---|---|---|
| | Assists with the professional growth and development of staff | 2 | | | |
| | Engages in professional growth and development of self | 2 | | | |

Subtotal: 4

| IV. SCHOOL LEADERSHIP (MANAGEMENT) | ADMINISTRATIVE CRITERIA | Exceeds | Meets | Does Not Meet | N/A |
|---|---|---|---|---|---|
| | Assists in the maintenance of a professional environment | ✕ | 1 | | |
| | Assists in the compliance of Board rules, policies, procedures, existing laws, and agreements | ✕ | 1 | | |
| | Demonstrates necessary organizational skills | 2 | | | |
| | Demonstrates sound and professional judgment | | 1 | | |
| | Coordinates and monitors implementation of after-school programs | 2 | | | |
| | Communicates and demonstrates interpersonal skills with faculty members, staff, students, and community | 2 | | | |
| | Assists the principal in a timely manner with administrative functions and any other duties as deemed necessary | 2 | | | |

Subtotal: 11

| V. TEACHER, PARENT AND COMMUNITY INVOLVEMENT | ADMINISTRATIVE CRITERIA | Exceeds | Meets | Does Not Meet | N/A |
|---|---|---|---|---|---|
| | Communicates the school curriculum and student achievement | 2 | | | |
| | Demonstrates a sensitivity to parents and community | 1 | | | |
| | Uses appropriate human relations strategies to promote school/community partnerships | 2 | | | |
| | Coordinates, monitors, and participates in community-oriented programs | 2 | | | |

Subtotal: 4

# ASSISTANT PRINCIPAL PERFORMANCE NARRATIVE

Focus areas wherein performance needs improvement*:

N/A

Evaluator's Comment(s):

Assistant Principal's Comment(s):

---

Focus areas wherein performance needs improvement*:

Evaluator's Comment(s):

Assistant Principal's Comment(s):

---

Focus areas wherein performance needs improvement*:

Evaluator's Comment(s):

Assistant Principal's Comment(s):

---

Focus areas wherein performance needs improvement*:

Evaluator's Comment(s):

Assistant Principal's Comment(s):

---

Focus areas wherein performance needs improvement*:

Evaluator's Comment(s):

Assistant Principal's Comment(s):

---

Evaluator's Signature: _____ Date: _____

Assistant Principal's Signature: _____ Date: _____

The Assistant Principal's signature indicates only that this Performance Summary was received. It does not indicate agreement or disagreement with the contents of the summary.

*As indicated in the Assistant Principal Performance Summary

**Assistant Principal Performance Evaluation Rating Scale:**

| |
|---|
| Exceeds = Over 93% of possible total points |
| Meets = 57% of possible total points |
| Does Not Meet = Below 57% of possible total points |

**Rating Range:**

| | Elementary Teaching Assistant | Elementary Freed Assistant | High School Assistant |
|---|---|---|---|
| Exceeds | 35 ~ 38 | 39 ~ 42 | 43 ~ 46 |
| Meets | 22 ~ 34 | 24 ~ 38 | 26 ~ 42 |
| Does Not Meet | 0 ~ 21 | 0 ~ 23 | 0 ~ 25 |

**Total Points:**

**Comment(s) (optional):**

Odette Lengfer provides extraordinary
support in the organization + management
of the early childhood center, After-School
Programs + Summer School Programs.
In addition she coordinates a wide
variety of special events.

Evaluator's Signature: _____ Date: 9/30/09

Assistant Principal's Signature: _____ Date: 9/30/09

The Assistant Principal's signature indicates only that this Performance Summary was received. It does not indicate agreement or disagreement with the contents of the summary

*Evaluator must complete the Assistant Principal Performance Narrative for any focus area where the Assistant Principal performance <u>DOES NOT MEET</u> the standards and expectations necessary to support academic achievement.

**Langer, Odette**

| | |
|---|---|
| **To...** | edilberto.aviles@comcast.com |
| **Cc...** | |
| **Bcc...** | |
| **Subject:** | Emergency LSC Meeting |
| **Attachments:** | |

Mr. Aviles,

I am contacting all LSC members to request an emergency meeting for either Thursday morning or Friday morning. Funds have been allocated for parent training and ESL parent training (which needs LSC approval) and I cleared deficits due to teacher's salary issues which also needs LSC approval.

I am willing to come in as early as 7:30 a.m. or whatever time the members agree on. This will be a quick meeting to vote on the issues so that these monies can be approved.

Please let me know by Wednesday morning or sooner if possible which morning is preferable.

Odette Langer, Principal Barry School

**EXHIBIT 10**

⚠️ Attachments can contain viruses that may harm your computer. Attachments may not display correctly.

**Langer, Odette**

| | | | |
|---|---|---|---|
| **From:** | Postmaster | **Sent:** | Tue 3/10/2009 3:54 PM |
| **To:** | Langer, Odette | | |
| **Cc:** | | | |
| **Subject:** | Delivery Status Notification (Relay) | | |
| **Attachments:** | 🔍 ⃞ Emergency LSC Meeting(1KB) | | |

This is an automatically generated Delivery Status Notification.

Your message has been successfully relayed to the following recipients, but the requested delivery status notifications may not be generated by the destination.

    edilberto.aviles@comcast.com

**EXHIBIT 11**

## Langer, Odette

| | | | |
|---|---|---|---|
| **From:** | Langer, Odette | **Sent:** | Wed 3/11/2009 11:30 AM |
| **To:** | edilberto.aviles@comcast.com | | |
| **Cc:** | | | |
| **Subject:** | | | |
| **Attachments:** | | | |

Mr. Aviles,

There will be at least 7 LSC members who will be able to come on Thursday at 9:00 a.m. for the emergency LSC meeting to vote on parent training money and removal of budget deficits.   Please let me know if you are able to come at the above time and date.

Odette Langer

**EXHIBIT 12**

⚠ Attachments can contain viruses that may harm your computer. Attachments may not display correctly.

**Langer, Odette**

| | | | |
|---|---|---|---|
| **From:** | Postmaster | **Sent:** | Wed 3/11/2009 11:30 AM |
| **To:** | Langer, Odette | | |
| **Cc:** | | | |
| **Subject:** | Delivery Status Notification (Relay) | | |
| **Attachments:** | 🔍 🗎 (no name)(1KB) | | |

This is an automatically generated Delivery Status Notification.

Your message has been successfully relayed to the following recipients, but the requested delivery status notifications may not be generated by the destination.

    edilberto.aviles@comcast.com

**EXHIBIT 13**

🌐 The sender of this message has requested a read receipt. Click here to send a receipt.

**Langer, Odette**

| | | | |
|---|---|---|---|
| **From:** | Villasenor, Jose B | **Sent:** | Fri 3/13/2009 9:47 AM |
| **To:** | 'Edilberto Aviles' | | |
| **Cc:** | Alvarez, Jose ; Langer, Odette ; Kallas, Joseph G; Montijo, Aida E | | |
| **Subject:** | RE: Barry School Special LSC Meeting Held On 3/12/09 | | |
| **Attachments:** | | | |

**EXHIBIT 15**

Dear Mr. Aviles:

Thank you for bringing this matter to our attention.  It is unfortunate if you were not advised of the special meeting of the Barry LSC held yesterday at the school.  Just to be clear, I want to restate the requirements for the calling of a special meeting of an LSC, which is sometimes referred to as a "call" meeting.

First, the chairperson or any four other members (including the principal) may call a special meeting.  Whomever calls the meeting is responsible for drafting a notice and agenda for the meeting and for posting them in compliance with the Open Meetings Act at least 48 hours in advance of the meeting  at the location of the meeting (usually the school).

The Illinois School Code, not the Open Meetings Act, requires them to also give **all** of the other LSC members (who are not participating in the calling of the meeting) notice of the time, place and purpose of the meeting in writing.  However, in imposing that requirement, the School Code does not state a minimum amount of time before the meeting by which that notice must be given.  Therefore, it would appear that notice in writing to the other members at least 48 to 24 hours in advance of the meeting, or perhaps even less, would be sufficient.  Also, while the School Code establishes that requirement, it does not establish any adverse consequences to the LSC member or members calling a special meeting or to the LSC when that requirement is not satisfied, such as providing that any actions taken in violation of that requirement will be invalid.

I am sharing this response with Ms. Langer so that she can again remind the Barry LSC Chairperson and members of the requirements for calling a special meeting.  Ms. Montijo will also remind the members of those requirements.

Sincerely,

Jose Villasenor

LSC & Community Relations

**EXHIBIT 14**

**From:** Edilberto Aviles [mailto:edilberto.aviles@comcast.net]
**Sent:** Thursday, March 12, 2009 7:35 PM
**To:** Alvarez, Jose
**Cc:** erios@designsforchange.org; Hernandez, Flavia ; Eason-watkins, Barbara J; Montijo, Aida E; Villasenor, Jose B; Kallas,

Joseph G; rsuarez@cityofchicago.org; Langer, Odette
**Subject:** Barry School Special LSC Meeting Held On 3/12/09
**Importance:** High

Jose Alvarez

Director of Community Affairs

Chicago Public Schools

125 S. Clark Street

Chicago, IL

Dear Mr. Alvarez:

It has come to my attention that a special LSC meeting was held today, 3/12/09 at 9:00 am. This afternoon I was questioned by a fellow LSC member as to why I did not attend the special meeting that was held this morning with the intent to move funds. This was the first I had heard that a meeting was to be held. I was not informed that there was going to be special meeting. I am especially frustrated since I was at the school this morning to take my son to his classroom and saw the principal who said nothing to me. Instead she saw me and immediately walked away. As we (the LSC council members), have been informed in previous meetings by Mr. Jose Villaseñor, that for a special LSC meeting to take place all members must be contacted in person by either the principal or chairperson 48 hours prior to the meeting. I did not receive a notice by e-mail, phone or in writing. This is illegal according to LSC rules and regulations. Other members were notified of the meeting, and some members not present at the meeting participated via phone. I feel that this was an intentional action since I have begun audio taping all the meetings and the principal and some members were opposed to this. I question the integrity of this budgetary change of public funds, since all members were not properly informed and given notice. I plan on contacting the States Attorney's Office and have them investigate whether or not these actions violate the Open Meetings Act of 2004. This yet another act of blatant negligence and disrespect of the LSC legal guidelines.

Sincerely,

Edilberto Aviles

LSC Parent Member

773/531-2389

Edilberto.aviles@comcast.net

ℹ️ This message was sent with high importance.

## Langer, Odette

| | | | |
|---|---|---|---|
| **From:** | Kallas, Joseph G | **Sent:** | Fri 3/13/2009 7:01 AM |
| **To:** | Langer, Odette | | |
| **Cc:** | | | |
| **Subject:** | FW: Barry School Special LSC Meeting Held On 3/12/09 | | |
| **Attachments:** | | | |

Odettte:  see below. Please let me know exactly what happened.

Jose Alvarez

Director of Community Affairs

Chicago Public Schools

125 S. Clark Street

Chicago, IL


Dear Mr. Alvarez:


It has come to my attention that a special LSC meeting was held today, 3/12/09 at 9:00 am.  This afternoon I was questioned by a fellow LSC member as to why I did not attend the special meeting that was held this morning with the intent to move funds. This was the first I had heard that a meeting was to be held.  I was not informed that there was going to be special meeting.  I am especially frustrated since I was at the school this morning to take my son to his classroom and saw the principal who said nothing to me.  Instead she saw me and immediately walked away.  As we (the LSC council members), have been informed in previous meetings by Mr. Jose Villaseñor, that for a special LSC meeting to take place all members must be contacted in person by either the principal or chairperson 48 hours prior to the meeting.  I did not receive a notice by e-mail, phone or in writing.  This is illegal according to LSC rules and regulations.  Other members were notified of the meeting, and some members not present at the meeting participated via phone.  I feel that this was an intentional action since I have begun audio taping all the meetings and the principal and some members were opposed to this.  I question the integrity of this budgetary change of public funds, since all members were not properly informed and given notice.  I plan on contacting the States Attorney's Office and have them investigate whether or not these actions violate the Open Meetings Act of 2004.  This yet another act of blatant negligence and disrespect of the LSC legal guidelines.

Sincerely,

Edilberto Aviles

LSC Parent Member

773/531-2389

Edilberto.aviles@comcast.net

**Subject:** Barry School Special LSC Meeting Held On 3/12/09
**Importance:** High

Jose Alvarez

Director of Community Affairs

Chicago Public Schools

125 S. Clark Street

Chicago, IL

Dear Mr. Alvarez:

It has come to my attention that a special LSC meeting was held today, 3/12/09 at 9:00 am. This afternoon I was questioned by a fellow LSC member as to why I did not attend the special meeting that was held this morning with the intent to move funds. This was the first I had heard that a meeting was to be held. I was not informed that there was going to be special meeting. I am especially frustrated since I was at the school this morning to take my son to his classroom and saw the principal who said nothing to me. Instead she saw me and immediately walked away. As we (the LSC council members), have been informed in previous meetings by Mr. Jose Villaseñor, that for a special LSC meeting to take place all members must be contacted in person by either the principal or chairperson 48 hours prior to the meeting. I did not receive a notice by e-mail, phone or in writing. This is illegal according to LSC rules and regulations. Other members were notified of the meeting, and some members not present at the meeting participated via phone. I feel that this was an intentional action since I have begun audio taping all the meetings and the principal and some members were opposed to this. I question the integrity of this budgetary change of public funds, since all members were not properly informed and given notice. I plan on contacting the States Attorney's Office and have them investigate whether or not these actions violate the Open Meetings Act of 2004. This yet another act of blatant negligence and disrespect of the LSC legal guidelines.

Sincerely,

Edilberto Aviles

LSC Parent Member

773/531-2389

Edilberto.aviles@comcast.net

**Sent:** Friday, March 13, 2009 8:48 AM
**To:** 'Edilberto Aviles'
**Cc:** Alvarez, Jose ; Langer, Odette ; Kallas, Joseph G; Montijo, Aida E
**Subject:** RE: Barry School Special LSC Meeting Held On 3/12/09


Dear Mr. Aviles:


Thank you for bringing this matter to our attention. It is unfortunate if you were not advised of the special meeting of the Barry LSC held yesterday at the school. Just to be clear, I want to restate the requirements for the calling of a special meeting of an LSC, which is sometimes referred to as a "call" meeting.


First, the chairperson or any four other members (including the principal) may call a special meeting. Whomever calls the meeting is responsible for drafting a notice and agenda for the meeting and for posting them in compliance with the Open Meetings Act at least 48 hours in advance of the meeting at the location of the meeting (usually the school).


The Illinois School Code, not the Open Meetings Act, requires them to also give **all** of the other LSC members (who are not participating in the calling of the meeting) notice of the time, place and purpose of the meeting in writing. However, in imposing that requirement, the School Code does not state a minimum amount of time before the meeting by which that notice must be given. Therefore, it would appear that notice in writing to the other members at least 48 to 24 hours in advance of the meeting, or perhaps even less, would be sufficient. Also, while the School Code establishes that requirement, it does not establish any adverse consequences to the LSC member or members calling a special meeting or to the LSC when that requirement is not satisfied, such as providing that any actions taken in violation of that requirement will be invalid.


I am sharing this response with Ms. Langer so that she can again remind the Barry LSC Chairperson and members of the requirements for calling a special meeting. Ms. Montijo will also remind the members of those requirements.


Sincerely,


Jose Villasenor

LSC & Community Relations

**EXHIBIT 16**

---

**From:** Edilberto Aviles [mailto:edilberto.aviles@comcast.net]
**Sent:** Thursday, March 12, 2009 7:35 PM
**To:** Alvarez, Jose
**Cc:** erios@designsforchange.org; Hernandez, Flavia ; Eason-watkins, Barbara J; Montijo, Aida E; Villasenor, Jose B; Kallas, Joseph G; rsuarez@cityofchicago.org; Langer, Odette

🔵 The sender of this message has requested a read receipt. Click here to send a receipt.

## Langer, Odette

| | | | |
|---|---|---|---|
| **From:** | Villasenor, Jose B | **Sent:** | Mon 3/16/2009 9:54 AM |
| **To:** | Kallas, Joseph G | | |
| **Cc:** | Alvarez, Jose ; Langer, Odette ; Montijo, Aida E | | |
| **Subject:** | RE: Barry School Special LSC Meeting Held On 3/12/09 | | |
| **Attachments:** | | | |

Mr. Kallas:

Thanks for the information.


Jose Villasenor

---

**From:** Kallas, Joseph G
**Sent:** Monday, March 16, 2009 9:00 AM
**To:** Villasenor, Jose B
**Cc:** Alvarez, Jose ; Langer, Odette ; Montijo, Aida E
**Subject:** RE: Barry School Special LSC Meeting Held On 3/12/09


FYI, Principal Odette Langer has provided to me copies of both the email she sent to Mr. Aviles and the posting of the meeting. She also has a copy of the delivery notification. I feel confident that Ms. Langer tried to contact Mr. Aviles about this meeting.


Joe Kallas

Area One Instruction Officer

Chicago Public Schools

6323 N. Avondale

Chicago, IL 60631

534-1113 (direct line)

534-1083 (Ana Rios, Executive Assistant)

534-1082 (facsimile)

**EXHIBIT 17**

-----Original Message-----
**From:** Villasenor, Jose B

⚠ Please treat this as Personal.
  This message was sent with high importance.

**Langer, Odette**

| | | | |
|---|---|---|---|
| **From:** | Langer, Odette | **Sent:** | Tue 3/24/2009 5:40 PM |
| **To:** | rhcajigas@ameritech.net | | |
| **Cc:** | ihtzy@yahoo.com | | |
| **Subject:** | FW: Barry School Crisis | | |
| **Attachments:** | | | |

Robert, Hope and Yeni,
Please see the letter below that Edilberto Aviles sent to Mr. Kallas and others.

This is becoming completely out of hand. I already have many teachers and staff that will attend the meeting and they are furious at his accusations. He is keeping the LSC from functioning and he is trying to ruin my reputation. Something has got to be done.

Please respond before the meeting to so that we can have a plan. I have asked my security guard to remain because if he has parents coming on his behalf I'm afraid there will be trouble.

Odette Langer

---

**From:** Kallas, Joseph G
**Sent:** Tue 3/24/2009 7:33 AM
**To:** 'Edilberto Aviles'
**Cc:** Hernandez, Flavia ; Eason-watkins, Barbara J; rsuarez@cityofchicago.org;
erios@designsforchange.org
**Subject:** RE: Barry School Crisis

Mr. Aviles: I had planned to attend another LSC meeting that evening. However, I will, instead, attend the Barry meeting.

Joe Kallas

Area One Instruction Officer

Chicago Public Schools

6323 N. Avondale

Chicago, IL 60631

534-1113 (direct line)

534-1083 (Ana Rios, Executive Assistant)

534-1082 (facsimile)

**EXHIBIT 18**

-----Original Message-----
**From:** Edilberto Aviles [mailto:edilberto.aviles@comcast.net]
**Sent:** Monday, March 23, 2009 6:51 PM
**To:** Kallas, Joseph G
**Cc:** Hernandez, Flavia ; Eason-watkins, Barbara J; rsuarez@cityofchicago.org; erios@designsforchange.org
**Subject:** Barry School Crisis
**Importance:** High

Dear Mr. Kallas,

Over the past year and half we have had several concerning issues take place at Barry school. We are asking that you please attend the LSC meeting scheduled for Wednesday March 25th at 6:00 pm so that parents and staff can voice their concerns. I speak as a former student of Barry School and as a parent of a child attending Barry School currently. Morale among both parents and staff is at an all time low. We are in desperate need of your support and guidance to facilitate a solution that will allow everyone involved to feel confident and secure.

Thank you for your continued support,

Edilberto Aviles

773-531-2389

edilberto.aviles@comcast.net

**Langer, Odette**

| | | |
|---|---|---|
| **From:** | Kapica, Hanna | **Sent:** Thu 3/25/2010 11:28 AM |
| **To:** | Langer, Odette | |
| **Cc:** | Villasenor, Jose B; Kallas, Joseph G; edilberto.aviles@comcast.net | |
| **Subject:** | RE: Barry lsc | |
| **Attachments:** | | |

## *Dear Ms. Langer:*

## *Thanks for the prompt response and I am assuming that someone came when Ms. Zuniga stepped out from the office. I am glad to hear that you accepted all the nomination forms.*

## *Thanks again for your cooperation in this matter.*

```
From: Langer, Odette
Sent: Wed 3/24/2010 9:58 PM
To: Kapica, Hanna
Cc: Villasenor, Jose B; Kallas, Joseph G
Subject: RE: Barry lsc

Ms. Kapica,
In the future it would be appreciated that you call Barry School to find out what are the true facts.
Knowing that the LSC facilitator was going to be absent on 3/24/10 it had been arranged for Sandra Zuniga to
accept all LSC nomination forms on 3/24/10 which in fact she did all day until the deadline.

Thank you,
Odette Langer
```

---

**From:** Kapica, Hanna
**Sent:** Wed 3/24/2010 2:50 PM
**To:** edilberto.aviles@comcast.net; Langer, Odette
**Cc:** Kallas, Joseph G; Villasenor, Jose B
**Subject:** RE: Barry lsc

Ms. Langer,

I am strongly suggesting for someone in your office to accept the LSC Elections nomination forms.

Thanks

---

**From:** edilberto.aviles@comcast.net [mailto:edilberto.aviles@comcast.net]
**Sent:** Wed 3/24/2010 10:41 AM
**To:** Kapica, Hanna
**Subject:** Barry lsc

We have parents trying to turn in lsc applications and they are being told that the lsc facilitator is not present and will not be at all today.
Sent from my BlackBerry® smartphone with SprintSpeed

**EXHIBIT 19**

**Langer, Odette**

| | | | |
|---|---|---|---|
| **From:** | Sandra Zuniga [SZuniga@cps.edu] | **Sent:** | Thu 3/25/2010 3:33 PM |
| **To:** | Langer, Odette ; Odette Langer | | |
| **Cc:** | | | |
| **Subject:** | | | |
| **Attachments:** | | | |

Hi Hanna, my name is Sandra Zuniga I sent this e-mail to Mr Kallas

3/25/2010

Mr. Kallas,
I am very upset about the e-mail that was sent by Mr. Aviles on 3/24/2010 to Hanna Kapica assuming that I wasn't doing my job. I am very offended at this situation that Mr. Aviles has put me in and would like this matter handled.

The facilitator had given me directions on how to handle applications in case she was ever out of the building or not in the office.

Mr. Aviles's e-mail says 10:41 a.m. The first application from a parent came in at
2:28 p.m. and I took care of the parents.

No one came to the office to hand in applications before 2:28 p.m. You can check with the security guard.

Can you please tell me who told Mr. Aviles that the facilitator was not in and wasn't available. I would like to know who the parents were that said their application was not being taken.

I am so upset. That this isn't the first time he has made accusations without first calling the school to check and see why this was being done. He did it before with the door situation and I'm tired of him saying "sorry" after the damage has been done. It seems to me that he has a personal vendeta to follow and actions of this matter don't belong in the LSC. The LSC function is to interact positively with the community and the school and he has not followed any interaction with the school bypassing this school in this accusation

I am an honest person and work hard at my job and I don't like what Mr. Aviles is doing to me and to the school.

Can you please get back to me with this matter.


Thank you,
Sandra Zuniga
773-534-3455




**EXHIBIT 20**

From: Edilberto Aviles <edilberto.aviles@comcast.net>
Subject: Barry school LSC
To: ihtzy@yahoo.com
Date: Wednesday, June 9, 2010, 7:35 PM

I just wanted to make you aware the these accomplishments Mrs. Langer has listed are false. This is why I will not participate and waste my time arguing over these issue with a group of people who have done nothing but enable her to lie and bring harm to our children ,teachers and are community. Mrs. Langer has had no control of the school budget this entire year. The classes she took were mandated by Mr. Kallas. The additional programs that were made available to the students were also mandated by Mr. Kallas. The only accomplishment Mrs. Langer has achieved is the attention she has brought to the school trough her actions and the help she has also brought to other schools that were facing the same situation we were.

EXHIBIT J

EXHIBIT 21

# CHICAGO PUBLIC SCHOOLS

### PRINCIPAL PERFORMANCE EVALUATION

**EXHIBIT 22**



## A Look at Principal Leadership: The 7 Standards

Each of the Chicago Standards for Developing School Leaders represents one aspect of a principal's that is important to school success. They were developed from the Interstate School Leaders Licens Consortium (ISLLC) standards, the "Five Essential Supports" and the state Standards for School Lea The Standards link to all CLASS (Chicago Leadership Academies for Supporting Success) programs, are sponsored by the Chicago Public Schools and the Chicago Principals and Administrators Associa

1. School Leadership
2. Instructional Leadership: Improving Teaching and Learning
3. Student-Centered Learning Climate
4. Professional Development and Human Resource Management
5. Parent Involvement and Community Partnerships
6. School Management and Daily Operations
7. Interpersonal Effectiveness

### Instructions: Rating Standards

Both the Local School Councils and Area Instructional Officers evaluate the principal on each of the 7 Standards. The Key Behavioral ratings under each Standard will help determine the appropriate rat for each Standard overall. To determine an appropriate rating for each Standard, complete pages 2 – Each page includes:

- a definition of the Standard;
- two or three categories under the Standard;
- a set of 10 Key Behaviors that describe actions that demonstrate skill in the Standard; and
- a numbered rating scale with behavior descriptions for each rating.

Rate each of the Key Behaviors using the scale below, based on how frequently the Key Behavior i demonstrated. As you complete each rating, please consider the principal's work on behalf of spec ulations, including children with disabilities, children who are bilingual and those who are homeless

On each page, circle the rating number (1 to 4) that is most accurate. If you are unable to rate a K Behavior, please refer to Appendix 2, the list of principal performance evaluation support materials pages 16 and 17 to help determine the materials you need to gather to complete the rating.

**Key Behavior Rating Scale:**

| | |
|---|---|
| 1 = Rarely (Almost never) | 3 = Often (Usually) |
| 2 = Occasionally (Every now and then) | 4 = Most of the time (Almost always) |

Once you have rated each Key Behavior, add the points and divide the total by 10 to get the Aver Rating for that Standard. The Average Rating should be between 1.0 and 4.0.

The Average Rating corresponds to the rating scale on the bottom of each Standard worksheet. Ci rating number that equals your Average Rating. If the rating is a number like 2.6 that falls between ratings, read the description of the rating above 2.6 (the rating for a 3) and the description of the below 2.6 (the rating for a 2) and circle the rating whose description best fits. (For example, a 2. changed to either a 2 or a 3.) That number will be your principal's rating in that Standard.

After completing pages 2-8, and after holding the Feedback Session with your principal, please tr final ratings for each Standard to the Evaluation Summary on page 11. Additional Evaluation criter also be added. For details about adding criteria, see page 9.

# 1. SCHOOL LEADERSHIP

**Definition:** Leads the school by building high performing teams, responsibly managing work and people, and enlisting others in the school vision.

**Key Behavior Rating Scale:**
1 = Rarely (Almost never)
2 = Occasionally (Every now and then)
3 = Often (Usually)
4 = Most of the time (Almost always)

**Builds High Performing Teams**

| | | | | |
|---|---|---|---|---|
| 1 | 2 | 3 | 4 | Encourages and responds to input from team members |
| 1 | 2 | 3 | 4 | Works with staff and students to establish and build teams within the school |
| 1 | 2 | 3 | 4 | Helps the team set inspiring goals |
| 1 | 2 | 3 | 4 | Focuses the team on achieving specific, measurable results |

**Coordinates the Work of Others**

| | | | | |
|---|---|---|---|---|
| 1 | 2 | 3 | 4 | Works in close partnership with the LSC and others on items such as SIPAAA development and school budget |
| 1 | 2 | 3 | 4 | Involves teachers, staff, parents, and community appropriately in decision making |
| 1 | 2 | 3 | 4 | Delegates responsibility and tasks well by setting and communicating expectations and timelines |

**Implements the Vision**

| | | | | |
|---|---|---|---|---|
| 1 | 2 | 3 | 4 | Develops the school vision with stakeholders (for example: LSC, parents, staff, and community members) |
| 1 | 2 | 3 | 4 | Directs the development of the SIPAAA, and ensures that the SIPAAA furthers the school vision |
| 1 | 2 | 3 | 4 | Communicates and demonstrates a clear personal vision for improving the school |

___ + ___ + ___ + ___ = 36

Total of Key Behavior Ratings (add the four column totals)

÷ 10 = 3.52

Average Rating (Between 1.0 and 4.0)

**Rating Scale for School Leadership:**
Circle the rating number that equals your Average Rating. (See page 1 for further instructions)

**4 = Exceeds:** Has a track record of successful school leadership by consistently building high-performing teams, delegating responsibility, and implementing the school vision.

**3 = Meets:** Often demonstrates school leadership, but is sometimes not strong at building high-performing teams, delegating responsibility, and implementing the school vision.

**2 = Needs Improvement:** Sometimes shows basic school leadership skills but is often ineffective at building high-performing teams, delegating responsibility, and implementing the school vision.

**1 = Unsatisfactory (does not meet):** Rarely leads the school, and is not effective at building high-performing teams, delegating responsibility, and implementing the school vision.

■ ■ ■ 2

## 2. INSTRUCTIONAL LEADERSHIP—IMPROVING TEACHING AND LEARNING

**Definition:** Promotes the success of all students by creating an instructional program that continually strives to improve teaching and learning.

**Key Behavior Rating Scale:**

1 = Rarely (Almost never)
2 = Occasionally (Every now and then)

3 = Often (Usually)
4 = Most of the time (Almost always)

**Assessment**

| | | | | |
|---|---|---|---|---|
| 1 | 2 | 3 | 4 | Evaluates student learning using a variety of techniques and sources of information |
| 1 | 2 | 3 | 4 | Analyzes and communicates data about students, staff, and community |
| 1 | 2 | 3 | 4 | Uses school and student data to create programs and activities that serve student needs and support the curriculum |
| 1 | 2 | 3 | 4 | Monitors the implementation of the SIPAAA using school data and other resources and provides monthly reports to the LSC |

**Curriculum**

| | | | | |
|---|---|---|---|---|
| 1 | 2 | 3 | 4 | Supports the Professional Personnel Advisory Committee (PPAC) and/or other staff committees to develop curriculum |
| 1 | 2 | 3 | 4 | Uses research, teacher expertise, and recommendations from professional associations to make curriculum decisions |
| 1 | 2 | 3 | 4 | Works with staff to align curriculum with city and state standards |

**Instruction**

| | | | | |
|---|---|---|---|---|
| 1 | 2 | 3 | 4 | Makes improvement of instruction his/her primary responsibility by monitoring instruction across classrooms and the school |
| 1 | 2 | 3 | 4 | Supports and promotes innovative teaching methods (including the use of technology) and encourages teachers to pilot appropriate innovative programs to engage students |
| 1 | 2 | 3 | 4 | Provides programs to meet the needs of special education and limited English proficient students |

+    +    +    =

Total of Key Behavior Ratings (add the four column totals)

÷ 10 = **3.48**

Average Rating (Between 1.0 and 4.0)

**Rating Scale for Instructional Leadership:**
Circle the rating number that equals your Average Rating. (See page 1 for further instructions)

**4 = Exceeds:** Has a track record of improving teaching and learning by getting input on curriculum, supporting a variety of teaching methods, and creating learning programs that are appropriate to the students.

**3 = Meets:** Often successfully improves teaching and learning, but is sometimes not strong at getting input on curriculum, supporting a variety of teaching methods, and/or creating learning programs that are appropriate to the students.

**2 = Needs Improvement:** Sometimes improves teaching and learning, but is often ineffective at getting input on curriculum, supporting a variety of teaching methods, and/or creating learning programs that are appropriate to the students.

**1 = Unsatisfactory (does not meet):** Rarely improves teaching and learning, and does little to promote student success.

CHICAGO PUBLIC SCHOOLS PRINCIPAL PERFORMANCE EVALUATION

## 3. STUDENT-CENTERED LEARNING CLIMATE

**Definition:** Creates and maintains a school environment that focuses on students and emphasizes high academic expectations, personalism, caring, discipline, and order.

**Key Behavior Rating Scale:**
1 = Rarely (Almost never)
2 = Occasionally (Every now and then)
3 = Often (Usually)
4 = Most of the time (Almost always)

**High Academic Expectations**

| 1 | 2 | 3 | 4 | Works with groups (such as the Professional Personnel Advisory Committee [PPAC], the Professional Problems Committee [PPC], staff, parents/community, and other committees) to set and communicate high academic expectations |
|---|---|---|---|---|
| 1 | 2 | 3 | 4 | Creatively develops and implements programs and policies to encourage, recognize and reward students' effort, success, and achievement |
| 1 | 2 | 3 | 4 | Helps teachers set and meet high expectations for themselves and their students |

**Personalism and Caring**

| 1 | 2 | 3 | 4 | Creates an atmosphere of respect among and towards students |
|---|---|---|---|---|
| 1 | 2 | 3 | 4 | Helps students and staff form productive and respectful relationships, which will, in turn, help improve academic achievement |
| 1 | 2 | 3 | 4 | Ensures that staff feel respected, valued, and important |

**Discipline and Order**

| 1 | 2 | 3 | 4 | Develops and implements a plan to maintain and/or increase student attendance |
|---|---|---|---|---|
| 1 | 2 | 3 | 4 | Implements and enforces policies and procedures, such as the school safety plan and staff handbook, consistently and responsibly to help ensure an environment that is safe, stable, and conducive to learning |
| 1 | 2 | 3 | 4 | Follows uniform discipline code and security plan, which are on file |
| 1 | 2 | 3 | 4 | Creates a school environment that supports students through crisis and other challenges |

+ ___ + ___ + ___ = ___                     ÷ 10 = 3.46

Total of Key Behavior Ratings (add the four column totals)          Average Rating (Between 1.0 and 4.0)

**Rating Scale for Student-Centered Learning Climate:**
Circle the rating number that equals your Average Rating. (See page 1 for further instructions)

**4 = Exceeds:** Has a track record of creating a student-centered climate by setting and communicating high academic expectations, creating an atmosphere of respect and caring, and maintaining discipline and order.

**3 = Meets:** Often successfully creates a student-centered climate, but is sometimes not strong at setting and communicating high academic expectations, creating an atmosphere of respect and caring, and/or maintaining discipline and order.

**2 = Needs Improvement:** Sometimes creates a student-centered climate, but is often ineffective due to an inability to set and communicate high academic expectations, create an atmosphere of respect and caring, and/or maintain discipline and order.

**1 = Unsatisfactory (does not meet):** Rarely creates a student centered learning climate, and is not effective at setting and communicating high academic expectations, creating an atmosphere of respect and caring, and/or maintaining discipline and order.

■ ■ ■ 4

## 4. PROFESSIONAL DEVELOPMENT AND HUMAN RESOURCES MANAGEMENT

**Definition:** Encourages professional development, recruits and selects outstanding staff, and effectively supervises teachers and staff in order to improve student learning and academic achievement.

**Key Behavior Rating Scale:**

1 = Rarely (Almost never)
2 = Occasionally (Every now and then)

3 = Often (Usually)
4 = Most of the time (Almost always)

### Professional Development

| | | | | |
|---|---|---|---|---|
| 1 | 2 | 3 | 4 | Encourages teachers to participate in staff development and provides them with the means to do so |
| 1 | 2 | 3 | 4 | Demonstrates a commitment to continually improve his/her knowledge, skills, and capabilities (e.g. attends in-service sessions, belongs to professional organizations or mentors other principals) |
| 1 | 2 | 3 | 4 | Develops and utilizes the human resource skills needed to manage teachers and staff |
| 1 | 2 | 3 | 4 | Links professional development with the SIPAAA goals |

### Recruitment and Hiring

| | | | | |
|---|---|---|---|---|
| 1 | 2 | 3 | 4 | Keeps track of personnel needs, moves quickly to fill vacancies with excellent teachers and staff (recognizing system-wide teacher shortage in some subject areas) and provides recommendations to the CEO about promotions and assignment of personnel |
| 1 | 2 | 3 | 4 | Involves staff and any LSC personnel committee in recruiting, hiring, and supporting new teachers and staff |

### Staff Observation/Evaluation and Instructional Supervision

| | | | | |
|---|---|---|---|---|
| 1 | 2 | 3 | 4 | Engages teachers in goal setting to improve classroom practice |
| 1 | 2 | 3 | 4 | Regularly reviews, revises and communicates expectations of teacher performance |
| 1 | 2 | 3 | 4 | Supports teachers, particularly new hires, by providing constructive feedback on a regular basis |
| 1 | 2 | 3 | 4 | Supervises and evaluates teachers, staff and assistant principals on their competence and productivity in accordance with Board rules, policies and procedures, and collective bargaining agreements |

+ ___ + ___ + ___ = ___          ÷ 10 = **3.50**

Total of Key Behavior Ratings (add the four column totals)          Average Rating (Between 1.0 and 4.0)

**Rating Scale for Professional Development and Human Resources Management:**
Circle the rating number that equals your Average Rating. (See page 1 for further instructions)

**4 = Exceeds:** Has a track record of promoting professional development and managing teachers and staff by consistently demonstrating a commitment to self-improvement, encouraging others to develop, providing feedback, and reviewing expectations with staff.

**3 = Meets:** Often succeeds at promoting professional development and managing teachers and staff, but is sometimes not strong at self-improvement, encouraging others to develop, providing feedback, and/or reviewing expectations with staff.

**2 = Needs Improvement:** Sometimes succeeds at promoting professional development and managing teachers and staff by demonstrating a commitment to self-improvement, encouraging others to develop, providing feedback, and/or reviewing expectations with staff.

**1 = Unsatisfactory (does not meet):** Rarely succeeds at promoting professional development and managing teachers and staff, and is not effective at developing self or staff.

## 5. PARENT INVOLVEMENT AND COMMUNITY PARTNERSHIPS

**Definition:** Collaborates with families and community members, responds to diverse community interests and needs, and uses community resources.

**Key Behavior Rating Scale:**
1 = Rarely (Almost never)
2 = Occasionally (Every now and then)
3 = Often (Usually)
4 = Most of the time (Almost always)

**Parent Involvement**

| | | | | |
|---|---|---|---|---|
| 1 | 2 | 3 | 4 | Creates programs that address parent needs |
| 1 | 2 | 3 | 4 | Encourages teachers to regularly communicate and meet with parents about classroom expectations/activities, student progress and suggestions for improvement |
| 1 | 2 | 3 | 4 | Removes obstacles for parents to get involved at school |
| 1 | 2 | 3 | 4 | Works with parents and community members as a member of the LSC and performs related duties |
| 1 | 2 | 3 | 4 | Communicates regularly to parents what is happening at the school |

**Community Partnerships**

| | | | | |
|---|---|---|---|---|
| 1 | 2 | 3 | 4 | Creates effective partnerships with businesses, community organizations, and agencies |
| 1 | 2 | 3 | 4 | Enlists help from the business community for the school |
| 1 | 2 | 3 | 4 | Makes the community feel welcome and encourages community participation |
| 1 | 2 | 3 | 4 | Establishes relationships and works cooperatively with community leaders, LSC members, and area schools |
| 1 | 2 | 3 | 4 | Invites feedback from the community |

___ + ___ + ___ + ___ = _____  ÷ 10 = **3.6**

Total of Key Behavior Ratings (add the four column totals)     Average Rating (Between 1.0 and 4.0)

**Rating Scale for Parent Involvement and Community Partnerships:**
Circle the rating number that equals your Average Rating. (See page 1 for further instructions)

**4 = Exceeds:** Has a track record of successfully involving parents and creating community partnerships by consistently providing helpful parent programs, making parents and community feel welcome, and establishing relationships with the community.

**3 = Meets:** Often involves parents and creates community partnerships, but is sometimes not strong at providing helpful parent programs, making parents and community feel welcome, and/or establishing relationships with the community.

**2 = Needs Improvement:** Sometimes involves parents and creates community partnerships, but is often ineffective due to weakness in providing helpful parent programs, making parents and community feel welcome, and/or establishing relationships with the community.

**1 = Unsatisfactory (does not meet):** Rarely involves parents and creates community partnerships, and is not effective at providing helpful parent programs and making parents and community feel welcome.

■ ■ ■ 6

## 6. SCHOOL MANAGEMENT & DAILY OPERATIONS

**Definition:** Manages school resources and facilities effectively, uses knowledge of policies and procedures to make sound decisions, and ensures the efficient operation of the school.

**Key Behavior Rating Scale:**

1 = Rarely (Almost never)              3 = Often (Usually)
2 = Occasionally (Every now and then)  4 = Most of the time (Almost always)

**Daily Operations**

| | | | | |
|---|---|---|---|---|
| 1 | 2 | 3 | 4 | Supervises personnel and resources to ensure facilities management |
| 1 | 2 | 3 | 4 | Organizes school resources to address instructional needs |
| 1 | 2 | 3 | 4 | Consistently prepares and files reports according to the instructions, guidelines and timelines of Board rules, policies and procedures, existing laws, and labor agreements to ensure smooth daily operations |
| 1 | 2 | 3 | 4 | Uses available technology to improve school administration and operations (such as attendance and budgets) |
| 1 | 2 | 3 | 4 | Maintains high standards and acts to ensure a clean school |

**Fiscal Management**

| | | | | |
|---|---|---|---|---|
| 1 | 2 | 3 | 4 | Develops a budget that is tied to instruction and then manages the budget so that funds are spent responsibly and in a timely manner |
| 1 | 2 | 3 | 4 | Secures supplemental funding (such as grants, discretionary funds) from outside sources to enhance school programs and ensures these resources are used for their designated purposes |
| 1 | 2 | 3 | 4 | Coordinates the budget and resources with the SIPAAA |
| 1 | 2 | 3 | 4 | Ensures fiscal policies are followed |
| 1 | 2 | 3 | 4 | Provides the LSC with budget and internal accounts reports on a monthly basis |

_____ + _____ + _____ + _____ =                    ÷ 10 = **3.52**

Total of Key Behavior Ratings (add the four column totals)          Average Rating (Between 1.0 and 4.0)

**Rating Scale for School Management & Daily Operations:**
Circle the rating number that equals your Average Rating. (See page 1 for further instructions)

**4 = Exceeds:** Has a track record of ensuring successful school operation by consistently managing the budget and ensuring the safe and efficient operation of the school.

**3 = Meets:** Often succeeds at managing school resources and daily operations, but is sometimes not strong at managing the budget and/or ensuring the safe and efficient operation of the school.

**2 = Needs Improvement:** Sometimes succeeds at managing school resources and daily operations effectively but is often ineffective at managing the budget and/or ensuring the safe and efficient operation of the school.

**1 = Unsatisfactory (does not meet):** Rarely manages school resources or daily operations effectively, and is not effective at managing the budget and/or ensuring the safe and efficient operation of the school.

## 7. INTERPERSONAL EFFECTIVENESS

**Definition:** Communicates well with diverse groups by understanding and responding to their values, goals, needs, concerns, feelings, and agendas, resolves conflicts productively, and engages others, as appropriate, in decision making.

**Key Behavior Rating Scale:**
1 = Rarely (Almost never)
2 = Occasionally (Every now and then)
3 = Often (Usually)
4 = Most of the time (Almost always)

**Communication**

| | | | | |
|---|---|---|---|---|
| 1 | 2 | 3 | 4 | Confronts and resolves problems in a timely manner |
| 1 | 2 | 3 | 4 | Builds collaboration, understanding, and respect between different groups (LSC, staff, parents, teachers, students, and community) |
| 1 | 2 | 3 | 4 | Effectively responds to concerns and issues of the LSC, parents, teachers, staff, students, and community when appropriate |
| 1 | 2 | 3 | 4 | Promotes active communication among teachers, parents and students |
| 1 | 2 | 3 | 4 | Uses ongoing written and oral communication to effectively communicate with different groups about school learning activities and student achievement, among other topics |

**Interpersonal Sensitivity**

| | | | | |
|---|---|---|---|---|
| 1 | 2 | 3 | 4 | Communicates an understanding of others' points of view, including the LSC, students, staff, parents, and community members |
| 1 | 2 | 3 | 4 | Maintains honesty and integrity in dealing with people |
| 1 | 2 | 3 | 4 | Honors confidences and confidential information, within the limits of the law |
| 1 | 2 | 3 | 4 | Follows through on promises and commitments |
| 1 | 2 | 3 | 4 | Motivates and inspires staff to contribute to the success of the school |

___ + ___ + ___ + ___ = ___      ÷ 10 = *3.5*

Total of Key Behavior Ratings (add the four column totals)    Average Rating (Between 1.0 and 4.0)

**Rating Scale for Interpersonal Effectiveness:**
Circle the rating number that equals your Average Rating. (See page 1 for further instructions)

**4 = Exceeds:** Has a track record of successfully understanding and interacting with diverse groups by consistently communicating an understanding of other points of view, responding to parent and community concerns, and facilitating collaboration, understanding and respect.

**3 = Meets:** Often understands and interacts effectively with diverse groups, but is sometimes not strong at communicating an understanding of other points of view, responding to parent and community concerns, and/or facilitating collaboration, understanding and respect.

**2 = Needs Improvement:** Sometimes interacts effectively with groups, but is often ineffective at communicating an understanding of other points of view, responding to parent and community concerns, and facilitating collaboration, understanding and respect.

**1 = Unsatisfactory (does not meet):** Rarely interacts with diverse groups, and is seldom able to understand other points of view or respond to parent and community concerns.

## ADDITIONAL EVALUATION CRITERIA: PRINCIPAL PERFORMANCE GOALS (OPTIONA

The Local School Council and principal may decide to add additional evaluation criteria to the pri
annual performance evaluation. If the LSC and principal add evaluation criteria, the principal and
should develop and <u>agree upon those criteria by November 4</u>. These criteria should be recorded l
written as Principal Performance Goals for the year with meets and exceeds criteria clearly definec
meets and exceeds criteria answer the questions: What does it mean to meet the goal? What doe
it mean to exceed the goal? For examples of goals and meets and exceed criteria, please refer tc
LSC training materials. If more than two goals are selected, please attach additional pages.

Evaluate achievement of the goals using the meets and exceeds definitions 1-4 and the rating sca
the Goal Rating for each goal. The ratings for the principal performance goals should be averagec
a final 1-4 rating. (To calculate the average rating, add the goal ratings together and divide by the
of goals rated.) This final rating should be circled at the bottom of this page and then transferred to

### Rating Scale
1 = Made little progress
2 = Made progress

3 = Met goal
4 = Exceeded goal

**Principal Performance Goal #1**          Circle the Rating for Goal #1          1          2

Goal
_____

_____

Corresponding Standard (1-7)
_____

Meets Criteria
_____

Exceeds Criteria
_____

**Principal Performance Goal #2**          Circle the Rating for Goal #2          1          2

Goal
_____

_____

Corresponding Standard (1-7)
_____

Meets Criteria
_____

Exceeds Criteria
_____

### AVERAGE RATING FOR ADDITIONAL CRITERIA          1          2          3

## INSTRUCTIONS: RATING PERFORMANCE MEASURES

Evaluators will use the performance measures data sheet provided by the CPS Department of Research and Evaluation to complete the evaluation summary on page 11. This data sheet will be distributed to schools in April. Detailed look-up tables that explain how your school's ratings were determined appear in Appendix 3 (pages 18 and 19).

**Test Scores**

The performance measure rating ("Exceeds", "Meets" and "Does Not Meet") for test scores will be determined by comparing the percentage in the most recent year to an average of percentages of scores for the previous three years. For tests administered in consecutive years, gains in test scores will also be evaluated by comparing the percentage in the most recent year to an average of percentages for the previous three years. This rating approach emphasizes improvement in each area and rewards principals accordingly.

**Elementary School Test Scores**
- ITBS Reading and Math*
- ISAT Composite

**High School Test Scores**
- TAP Reading*

Prairie State Achievement Exam composite results will also be provided to high schools for evaluators' reference. When enough years of data are available, PSAE results will be evaluated for the purpose of principal evaluation.

**Other Performance Measures**

As with test scores, attendance rate (elementary and high schools), dropout rate (high schools) and four-year graduation rate (high schools) are evaluated based on the current rate compared to the amount of improvement from an average of the three previous years. Again, this rating approach rewards for improvement in each area.

*\* Schools will receive results for students traditionally included in reporting and results for all students, including those tested with minor or major accommodations. Evaluators should consider both sets of results when completing the principal's evaluation. However, only the results from traditional reporting will be used to determine the performance measure rating this year. When legal requirements for testing change, principal evaluation will be based on results of all students.*

# EVALUATION SUMMARY

## Standards Overall Rating

Please transfer the rating for each of the 7 Standards, multiple by either 1 or 2 as defined in the chart and then add the numbers in the Result column. Check the Standards overall rating, using the range below the chart.

| Standards | Rating (1-4) | Multiply | Result |
|---|---|---|---|
| Standard 1:  School Leadership | 3.52 | x 1 | 3.52 |
| Standard 2:  Instructional Leadership - Improving Teaching and Learning | 3.48 | x 2 | 6.96 |
| Standard 3:  Student-Centered Learning Environment | 3.46 | x 1 | 3.46 |
| Standard 4:  Professional Development and Human Resource Management | 3.50 | x 1 | 3.50 |
| Standard 5:  Parent Involvement and Community Partnerships | 3.60 | x 1 | 3.60 |
| Standard 6:  School Management and Daily Operations | 3.52 | x 1 | 3.52 |
| Standard 7:  Interpersonal Effectiveness | 3.50 | x 1 | 3.50 |
| Additional Evaluation Criteria*  (OPTIONAL) | | | |
| ■ ■ ■  Grand Total | | | 28.06 |

## Rating Ranges for Standards (check one)

☒ Exceeds 28-32          ☐ Meets 21-27          ☐ Does Not Meet 8-20

*If the LSC and the principal choose to rate additional evaluation criteria, please contact the Area Instructional Office for the rating ranges that incorporate the 7 Standards plus the additional evaluation criteria.

## Performance Measures Overall Rating

Please use the lookup tables to determine the "Exceeds", "Meets" or "Does Not Meet" rating for each performance measure. Write the corresponding value in the columns below.  Add the values in all three columns. Use this final value to determine the overall rating for performance measures by reading the ranges below the chart. Check the final rating.

| Elementary Schools' Performance Measures | Exceeds (2) | Meets (1) | Does Not Meet (0) |
|---|---|---|---|
| ITBS | | | |
| ISAT | | | |
| Attendance Rate | | | |
| ■ ■ ■  Grand Total | | | |

### Elementary School Rating Ranges for Performance Measures (check one)

☐ Exceeds 5-6          ☐ Meets 2-4          ☐ Does Not Meet 0-1

| High Schools' Performance Measures | Exceeds (2) | Meets (1) | Does Not Meet (0) |
|---|---|---|---|
| TAP Reading | | | |
| Attendance Rate | | | |
| Graduation Rate | | | |
| Dropout Rate | | | |
| ■ ■ ■  Grand Total | | | |

### High School Rating Ranges for Performance Measures (check one)

☐ Exceeds 6-8          ☐ Meets 3-5          ☐ Does Not Meet 0-2

CHICAGO PUBLIC SCHOOLS PRINCIPAL PERFORMANCE EVALUATION

# PRINCIPAL EVALUATION COMMENTS

**Local School Council Comments**

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

| | |
|---|---|
| Signature | Date |

| | |
|---|---|
| Name | Title |

■  ■  ■  12

**Principal's Response**

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Signature _____    Date _____

Name _____    Title _____

CHICAGO PUBLIC SCHOOLS PRINCIPAL PERFORMANCE EVALUATION

13

# PRINCIPAL EVALUATION FORM

School __*Barry*__                                          Area __*1*__

Principal __*Odette Langer*__

Signature __*Odette Langer*__                    Date __*6-10-10*__

LSC Chair __(signature)__   / *Edith Jayeuse*

Signature __(signature)__                          Date __*6-10-10*__

Date of LSC/Principal Feedback Session __*June 11, 2010*__

Area Instructional Officer __*Joe Kellas*__

Signature _____                Date _____

Principal Contract Period _____   Number of Years as Principal __*3*__

*Appendix 1*

## 1. SCHOOL LEADERSHIP

**Definition:** Leads the school by building high performing teams, responsibly managing work and people, and enlisting others in the school vision.

**Key Behavior Rating Scale:**

1 = Rarely (Almost never)                    3 = Often (Usually)

2 = Occasionally (Every now and then)        4 = Most of the time (Almost always)

**Builds High Performing Teams**

| | | | | |
|---|---|---|---|---|
| 1 | 2 | 3 | 4 | Encourages and responds to input from team members |
| 1 | 2 | 3 | 4 | Works with staff and students to establish and build teams within the school |
| 1 | 2 | 3 | 4 | Helps the team set inspiring goals |
| 1 | 2 | 3 | 4 | Focuses the team on achieving specific, measurable results |

**Coordinates the Work of Others**

| | | | | |
|---|---|---|---|---|
| 1 | 2 | 3 | 4 | Works in close partnership with the LSC and others on items such as SIPAAA development and school budget |
| 1 | 2 | 3 | 4 | Involves teachers, staff, parents, and community appropriately in decision making |
| 1 | 2 | 3 | 4 | Delegates responsibility and tasks well by setting and communicating expectations and timelines |

**Implements the Vision**

| | | | | |
|---|---|---|---|---|
| 1 | 2 | 3 | 4 | Develops the school vision with stakeholders (for example: LSC, parents, staff, and community members) |
| 1 | 2 | 3 | 4 | Directs the implementation of SIPAAA, monitors progress and provides monthly reports to LSC |
| 1 | 2 | 3 | 4 | Communicates and demonstrates a clear personal vision for improving the school |

+ ___ + ___ + ___ = ___                    + 10 = ___

Total of Key Behavior Ratings (add the four column totals)        Average Rating (Between 1.0 and 4.0)

**Rating Scale for School Leadership:**

Circle the rating number that equals your Average Rating. (See page 1 for further instructions)

**4 = Exceeds:** Has a track record of successful school leadership by consistently building high-performing teams, delegating responsibility, and implementing the school vision.

**3 = Meets:** Often demonstrates school leadership, but is sometimes not strong at building high-performing teams, delegating responsibility, and implementing the school vision.

**2 = Needs Improvement:** Sometimes shows basic school leadership skills but is often ineffective at building high-performing teams, delegating responsibility, and implementing the school vision.

**1 = Unsatisfactory (does not meet):** Rarely leads the school, and is not effective at building high-performing teams, delegating responsibility, and implementing the school vision.

CHICAGO PUBLIC SCHOOLS PRINCIPAL PERFORMANCE EVALUATION

*Appendix 2*

# PRINCIPAL PERFORMANCE EVALUATION SUPPORT MATERIALS

This list of support materials is provided to assist LSCs as they look for evidence of work in the 7 Standard areas. This list contains examples and suggestions; it is not all inclusive. The exact types of supporting materials will vary from school to school. LSCs should consider both the quantity and quality of these materials and the activities and programs they reflect.

**Standard 1: School Leadership**
Builds High Performing Teams
- Lists of all teams and their members
- Team meeting sign-in sheets and/or minutes from meetings
- Minutes from grade-level team meetings

Coordinates the Work of Others
- List of SIPAAA meetings and attendance rosters
- List of budget meeting and attendance rosters

Implements the Vision
- Current SIPAAA
- Written vision and/or mission statement
- Principal's monthly reports to the LSC

**Standard 2: Instructional Leadership – Improving Teaching and Learning**
Assessment
- Sample of student data analysis with goals identified
- Schedule of teacher observations by principal

Curriculum
- Agendas and minutes of curriculum development meetings
- PPAC reports

Instruction
- Technology plan
- List of innovative supplemental programs

**Standard 3: Student-Centered Learning Climate**
High Academic Expectations
- Lists of student clubs/after school activities and samples of minutes from meetings, as appropriate
- Lists and descriptions of student recognition or award programs
- PPAC reports
- Sample student learning contracts

Discipline and Order
- Safety and security plan is on file
- Copy of staff handbook
- Discipline reports

**Standard 4: Professional Development and Human Resource Management**
Professional Development
- Staff development agendas, attendance rosters and workshop evaluations
- List of completed staff development activities (conferences, workshops, CASL, Administrator's Academy, etc.)
- List of state-required and other in-services/conferences attended by principal
- List of principal's professional memberships
- List of principal's mentoring activities

Recruitment and Hiring
- Summary of staff hired and fired, with sample exit survey
- List of referral contacts

Teacher Observation and Instructional Supervision
- Record of teacher goals
- Calendar of pre-conference, visitation and post-conference meetings
- Copies of teacher lesson plans

**Standard 5: Parent Involvement and Community Partnerships**
Parent Involvement
- Lists of parent activities/volunteer opportunities/meetings and names of participants
- Parent surveys and corresponding summaries of responses
- Newsletters, bulletins or flyers sent to parents
- Numbers of parents who attended report card pick-up days

Community Partnerships
- Lists and descriptions of community partnerships
- List of community use of school
- Community surveys and corresponding summaries of responses
- Visitor sign-in book

**Standard 6: School Management & Daily Operations**
Daily Operations
- Facilities, safety and security reports

Fiscal Management
- Monthly budget reports to LSC
- Monthly Internal Accounts statements to AIO and LSC (in LSC minutes)
- Inventory of school materials

**Standard 7: Interpersonal Effectiveness**
Communication
- Copies of letters and flyers sent home with students
- Bulletins and e-mails to staff

*Appendix 3*

# PERFORMANCE MEASURES LOOK-UP TABLES: ELEMENTARY SCHOOLS

■ ■ ■ **ITBS — Iowa Tests of Basic Skills**

ITBS results are reported as a percentage at or above national norms for grades 3 through 8 combined. Results reflect scores for all students traditionally included in reporting. For the purpose of principal evaluation, the absolute scores for math and reading and the gains for math and reading are each rated individually, and are then combined to return an overall rating.

**ITBS ABSOLUTE SCORES FOR READING & MATH**

| | Percent At or Above National Norms | | | | | |
|---|---|---|---|---|---|---|
| Amount of Change | Below 25% | 25% to 37.4% | 37.5% to 49.9% | 50% to 62.4% | 62.5% to 75% | Greater than 75% |
| Improved more than 6% | Meets | Meets | Exceeds | Exceeds | Exceeds | Exceeds |
| 3.0% to 5.9% | Meets | Meets | Meets | Exceeds | Exceeds | Exceeds |
| 0.0% to 2.9% | Does Not Meet | Meets | Meets | Meets | Exceeds | Exceeds |
| -3.0% to -0.01% | Does Not Meet | Does Not Meet | Does Not Meet | Meets | Meets | Exceeds |
| -6.0% to -3.01% | Does Not Meet | Does Not Meet | Does Not Meet | Meets | Meets | Meets |
| Decreased more than -6% | Does Not Meet | Does Not Meet | Does Not Meet | Does Not Meet | Meets | Meets |

**ITBS READING & MATH GAINS**

Gains are currently being calculated using developmental standard scores instead of the grade-equivalent scale historically used by CPS. A chart for ITBS reading and math gains will be distributed to schools by April.

■ ■ ■ **ISAT - Illinois Standards Achievement Test**

The ISAT score is the percent of students who meet or exceed state standards. It is a composite of all five subjects on the exam.

| | Percent of Students that Meet or Exceed State Standards | | | | | |
|---|---|---|---|---|---|---|
| Amount of Change | Below 25% | 25% to 37.4% | 37.5% to 49.9% | 50% to 62.4% | 62.5% to 75% | Greater than 75% |
| Improved more than 6% | Meets | Meets | Exceeds | Exceeds | Exceeds | Exceeds |
| 3.0% to 5.9% | Meets | Meets | Meets | Exceeds | Exceeds | Exceeds |
| 0.0% to 2.9% | Does Not Meet | Meets | Meets | Meets | Exceeds | Exceeds |
| -3.0% to -0.01% | Does Not Meet | Does Not Meet | Does Not Meet | Meets | Meets | Exceeds |
| -6.0% to -3.01% | Does Not Meet | Does Not Meet | Does Not Meet | Meets | Meets | Meets |
| Decreased more than -6% | Does Not Meet | Does Not Meet | Does Not Meet | Does Not Meet | Meets | Meets |

■ ■ ■ **Attendance Rate**

Attendance rate is the average percentage of students attending school each day.

| | Attendance Rate | | | | | |
|---|---|---|---|---|---|---|
| Amount of Change | Below 91% | 91% to 91.9% | 92% to 92.9% | 93% to 93.9% | 94% to 94.9% | 95% and Above |
| Improved more than 1% | Meets | Meets | Meets | Exceeds | Exceeds | Exceeds |
| .5% to .99% | Does Not Meet | Meets | Meets | Meets | Exceeds | Exceeds |
| 0% to .49% | Does Not Meet | Does Not Meet | Meets | Meets | Meets | Exceeds |
| -.5% to -.01% | Does Not Meet | Does Not Meet | Does Not Meet | Meets | Meets | Exceeds |
| -1% to -.49% | Does Not Meet | Does Not Meet | Does Not Meet | Meets | Meets | Exceeds |
| Decreased more than -1% | Does Not Meet | Does Not Meet | Does Not Meet | Meets | Meets | Meets |

# PERFORMANCE MEASURES LOOK-UP TABLES: HIGH SCHOOLS

### ■ ■ ■ TAP Reading

TAP results for Reading Comprehension are reported as a percentage at or above national norms. The results are for grades 9 and 10 combined. They reflect scores of only those students traditionally included in reporting.

| Amount of Change | Percent At or Above National Norms | | | |
|---|---|---|---|---|
| | Below 25% | 25% to 49.9% | 50% to 74.9% | Greater than 75% |
| Improved more than 6% | Meets | Meets | Exceeds | Exceeds |
| 3.0% to 5.9% | Meets | Meets | Exceeds | Exceeds |
| 0.0% to 2.9% | Does Not Meet | Meets | Exceeds | Exceeds |
| -3.0% to -0.01% | Does Not Meet | Does Not Meet | Meets | Exceeds |
| -6.0% to -3.01% | Does Not Meet | Does Not Meet | Meets | Meets |
| Decreased more than -6% | Does Not Meet | Does Not Meet | Meets | Meets |

### ■ ■ ■ Attendance Rate

Attendance rate is the average percentage of students attending school each day.

| Amount of Change | Attendance Rate | | | | | |
|---|---|---|---|---|---|---|
| | Below 75% | 75% to 79.9% | 80% to 84.9% | 85% to 89.9% | 90% to 94.9% | 95% and Above |
| Improved more than 4% | Meets | Meets | Exceeds | Exceeds | Exceeds | Exceeds |
| 3% to 3.99% | Meets | Meets | Exceeds | Exceeds | Exceeds | Exceeds |
| 2% to 2.99% | Meets | Meets | Meets | Exceeds | Exceeds | Exceeds |
| 1% to 1.99% | Does Not Meet | Meets | Meets | Exceeds | Exceeds | Exceeds |
| 0% to .99% | Does Not Meet | Meets | Meets | Meets | Exceeds | Exceeds |
| -1% to -.01% | Does Not Meet | Does Not Meet | Meets | Meets | Meets | Exceeds |
| -2% to -1.01% | Does Not Meet | Does Not Meet | Meets | Meets | Meets | Exceeds |
| Decreased more than -2% | Does Not Meet | Does Not Meet | Does Not Meet | Meets | Meets | Exceeds |

### ■ ■ ■ Graduation Rate

The graduation rate for a particular class is calculated by dividing the number of students who graduate from a school in June by the number of students who entered that school in the fall, four years earlier. Students transferring out of a school are excluded from the calculation.

| Amount of Change | Graduation Rate | | | | | | |
|---|---|---|---|---|---|---|---|
| | Below 55% | 55% to 59.9% | 60% to 64.9% | 65% to 69.9% | 70% to 74.9% | 75% to 79.9% | 80% and Above |
| Improved more than 10% | Meets | Meets | Exceeds | Exceeds | Exceeds | Exceeds | Exceeds |
| 5% to 9.9% | Meets | Meets | Meets | Exceeds | Exceeds | Exceeds | Exceeds |
| 0% to 4.9% | Meets | Meets | Meets | Meets | Exceeds | Exceeds | Exceeds |
| -5% to -.01% | Does Not Meet | Does Not Meet | Meets | Meets | Meets | Meets | Meets |
| -10% to -5.01% | Does Not Meet | Does Not Meet | Meets | Meets | Meets | Meets | Meets |
| Decreased more than -10% | Does Not Meet | Does Not Meet | Does Not Meet | Does Not Meet | Meets | Meets | Meets |

### ■ ■ ■ Dropout Rate

This one-year dropout rate is the percentage of students grades 9 through 12 (or equivalent) who dropout in a given school year. The formula includes students in all CPS schools except the Cook County jail and juvenile detention center schools that serve students from all of Cook County and not just CPS students. The rate also includes high school students in elementary units with high school grades. Finally, the population used in the calculation includes all students enrolled in a school during the school year except those who validly transferred out of the school.

| Amount of Change | Dropout Rate | | | |
|---|---|---|---|---|
| | 0% to 9.9% | 10% to 19.9% | 20% to 29.9% | 30% and Above |
| Increased more than 10% | | Meets | Does Not Meet | Does Not Meet |
| 5% to 9.9% | Exceeds | Meets | Does Not Meet | Does Not Meet |
| 0% to 4.99% | Exceeds | Meets | Does Not Meet | Does Not Meet |
| -5% to -.01% | Exceeds | Meets | Does Not Meet | Does Not Meet |
| -10% to -5.01% | Exceeds | Exceeds | Meets | Meets |
| Decreased more than -10% | Exceeds | Exceeds | Meets | Meets |

# APPENDIX 2

## Confidentiality Agreement and Code of Conduct Agreement for Principal Evaluation

5/17/2007

Chapter 5 • Principal Performance Evaluation

## Confidentiality Agreement and Code of Conduct for Principal Evaluation

There are some key specifics your Principal Evaluation Team must abide by when they are involved in the evaluation process, which are incorporated into the agreement below.

You may want to have each of the individuals who will be involved in your principal evaluation process sign this agreement, which incorporates these requirements. Your LSC chairperson should collect the signed agreements during your first LSC meeting regarding principal evaluation. In addition, members should also monitor each other to ensure that all members are adhering to the following conditions.

> I agree that I will not make any evaluation decisions on the basis of a person's race, color, ethnicity, national origin, religion, age, sex, marital status, parental status, mental or physical disability (unrelated to job performance), finances, or sexual orientation. Furthermore, I will not ask any questions or make any comments during the evaluation that pertain to these topics.

> I agree to adhere to the requirements of the Open Meetings Act.

> I agree that I will conduct the principal evaluation process and make a retention decision based on the best interests of the school as determined by the standards stated in the Illinois School Code.

> I agree that I will not conduct this principal evaluation process or make a retention decision based on personal issues not related to standards stated in the Illinois School Code.

> Furthermore, I agree to keep all discussion, documentation, and information related to the principal evaluation process completely confidential.

Name: _Hope Cajigas  Robert Cajigas  Melzine Raymond  Tracy Baugher_

Date: _6-10-10_

*Agreement based on materials developed by Designs for Change and PENCUL.*

5/17/2007

# ISAT 2010 Reading
## Top 15 Schools Value-Added Performance

EXHIBIT 23

| Area | School Name | Principal Name | Number of students | Average SS Growth | Average Expected SS Growth | Value Add 2010 | % M/E 2010 |
|---|---|---|---|---|---|---|---|
| 7 | LAURA WARD | Relanda Marguerita Hobbs | 442 | 22.3 | 12.3 | 10.0 | 79.1% |
| 7 | GREGORY | Donella Carter | 372 | 19.4 | 12.3 | 7.1 | 70.8% |
| 2 | DECATUR | Susan Josephine Kukielka | 288 | 16.4 | 9.5 | 6.9 | 100.0% |
| 4 | CHOPIN | Antuanette Marie Mester | 296 | 17.3 | 10.9 | 6.4 | 91.8% |
| 16 | KELLER | Latanya Danett Mcdade | 234 | 11.3 | 6.2 | 5.1 | 100.0% |
| 5? | TALMAN | Jacqueline Medina | 338 | 16.5 | 12.2 | 4.3 | 73.8% |
| 7 | HEFFERAN | Jacqueline Faye Hearns | 318 | 15.6 | 11.2 | 4.3 | 76.1% |
| 2 | NETTELHORST | Cindy A Wulbert | 632 | 15.3 | 11.0 | 4.3 | 86.6% |
| 7 | WEBSTER | Princetta E Preston | 419 | 15.5 | 11.2 | 4.3 | 70.4% |
| 1 | BARRY | Odette Langer | 877 | 19.3 | 15.3 | 4.0 | 63.2% |
| 14 | MAYS | Patricia Davis Mccann | 353 | 15.2 | 11.2 | 3.9 | 67.2% |
| 28 | HOWE | Keisha S Campbell | 534 | 16.4 | 12.6 | 3.8 | 62.4% |
| 15 | WOODLAWN | Frank E Embil | 225 | 17.6 | 13.8 | 3.7 | 77.2% |
| 14 | LENART | Joanna Darcella Theodore | 324 | 8.7 | 5.1 | 3.7 | 100.0% |
| 52 | CICS-WRIGHTWOOD | David Lewis | 706 | 14.1 | 10.5 | 3.6 | 72.9% |

Laura Ward, Chopin and Howe are in the top 15 schools for both Math and Reading

June 14, 2010

Attention to:

Joe Kallas
Chief Area Officer, Areas One and Six
Chicago Public Schools
6323 N. Avondale
Chicago, Il. 60631

PRINCIPAL'S RESPONSE TO
MR. AVILES' REASONS FOR NOT PARTICIPATING IN THE LSC'S
EVALUATION OF THE BARRY SCHOOL PRINCIPAL

On Thursday June 10, 2010, Barry Elementary School's LSC evaluated me, Odette Langer, the school's principal, and gave me the highest rating – that of exceeding the seven performance goals. (Mr. Edilberto Aviles decided that he would not attend the LSC meeting or submit a formal evaluation of the principal.) The previous year, I had met the performance goals for a principal, although, Mr. Aviles is believed to have given me the lowest ratings possible. The year before that there was no principal evaluation, since Mr. Aviles had delayed the voting until it was too late for the LSC to submit an evaluation.

Approximately three years ago, I, who had been receiving the highest possible performance ratings as Assistant Principal of Barry School, who had previously passed the examination for becoming Superintendent of Schools, and had other accomplishments, decided to run for principal of Barry School. Mr. Aviles was the only LSC member that did not vote for me to become principal; prior to that time I never had a personal conversation with Mr. Aviles other then essentially saying "hello" at LSC meetings that I attended prior to I becoming principal. He knew of me, that I was not of his ethnicity or his religion because I was always absent on certain religious holidays.

Mr. Aviles had been and is still running a campaign against me sending e-mails to various Chicago Public School officials, with copies to about 5 or 6 other officials, about his imaginary complaints, at times every two weeks; some of these were sent directly to you, Mr. Kallas.

On June 10, 2010, Mr. Aviles, who normally attends all LSC meetings, decided to prevent a vote on the principal evaluation by convincing two other LSC members not to attend the LSC meeting that day, so that there would not be a proper quorum.

Four of the five people who attended that LSC meeting are people who were very active in the school and see what is occurring. Two of them are teachers. Mr. Aviles says that these people have done nothing but enable the principal to lie and bring harm to our community and its children. A proper poll by University of Chicago staff members shows that the parents and the children have a high opinion of Barry School and the opinions were higher than prior to my becoming principal.

My accomplishments are well documented. A substantial amount of the programs that were in effect during the past year, I had in effect previously. Although, each year there

**EXHIBIT 25**

will be changes, such as your requests, which I have fulfilled, to have a track team or having a group of ten people doing something for which I would have three people. I, have staff development days in which in-services are given to the whole staff. These may be led by me or outsiders and points of view are exchanged.

For some reason Mr. Aviles has stated that I have taken classes mandated by you. He may be indicating the meetings that you hold with all principals or when the Board is making a presentation on a new system to which principals and assistant principals attend.

Mr. Aviles stated that I have had no control over the school budget this entire year. He apparently does not know that you have had me prepare the budget within the amount of money that the Board has allowed to be spent. Of course, you have the decision as to what if anything you would like to modify. And of course the Board can change its mind on the amount of money that can be spent or how it is to be spent.

It is my belief that Mr. Aviles actions toward me are discriminatory.

Sincerely,

Odette Langer
Barry Elementary School Principal

**CHICAGO PUBLIC SCHOOLS | CPS**

# Value-Added School Report
## John Barry School, 2007–08

This report provides you with a summary of your school's impact on student academic growth.

Academic growth is defined as the scale score increase on the ISAT examination from the previous year to the current year. It is measured for both the ISAT Mathematics and Reading examinations.

Value-added is a nationally recognized way of measuring growth that is used in multiple districts nationwide. At Chicago Public Schools (CPS), the value-added metric has been developed in collaboration with academic experts from the University of Wisconsin.

The value-added metric is a more informative, accurate and equitable way to measure how your students progress from one year to the next. It is more informative because it measures the actual *amount of growth*, in ISAT scale score points; more accurate because it reflects growth at *all levels* of student achievement; and more equitable because it accounts for *differences* in student populations.

Student progress varies by grade, prior performance and demographics. The value-added metric accounts for these factors, comparing students along the following dimensions: grade level, prior ISAT score, IEP status, ELL status, free and reduced-price lunch status, gender, and number of times a student changed schools between ISAT examinations.

Value-added metrics provide data to help you answer questions such as, How much does a school contribute to student growth? and How does this impact differ across grade levels? The value-added metrics are an additional piece of information to help you make informed decisions that can lead to better instruction for your students — ensuring that every child in every school is on track at every stage in his or her CPS career to graduate prepared for success in postsecondary school and work.

On average, the year-to-year gain between 2007 and 2008 for your students in reading was *0.6 scale score points lower* than similar students district-wide.

On average, the year-to-year gain for your students in math was *1.2 scale score points lower* than similar students district-wide.

### SCHOOL-LEVEL VALUE-ADDED 2007-08

|  | Value-Added Score | Value-Added Ranking in CPS |
|---|---|---|
| Reading | -0.6 | 37th percentile |
| Math | -1.2 | 31st percentile |

### GRADE-LEVEL VALUE-ADDED 2007-08

|  | Reading | | Math | |
|---|---|---|---|---|
|  | Value-Added Score | Value-Added Ranking in CPS | Value-Added Score | Value-Added Ranking in CPS |
| 3rd to 4th | -2.7 | 24th percentile | -2.8 | 20th percentile |
| 4th to 5th | -0.2 | 51st percentile | 0.6 | 55th percentile |
| 5th to 6th | 2.3 | 80th percentile | 1.8 | 67th percentile |
| 6th to 7th | -3.6 | 11th percentile | -5.2 | 14th percentile |
| 7th to 8th |  |  |  |  |



**Inside:**
- Growth and attainment district-wide
- Value-added as a school-wide diagnostic
- Analysis of student growth

*Scores only reported if number of students > 10. See pg. 4 for data on number of students.*

---

**EXHIBIT 26**

---

**CHICAGO PUBLIC SCHOOLS | CPS**

# Value-Added School Report

## John Barry School, 2008-2009

This report provides you with a summary of your school's impact on student academic growth.

Academic growth is defined as the scale score increase on the ISAT examination from the previous year to the current year. It is measured for both the ISAT Mathematics and Reading Examinations.

Value-added is a nationally recognized way of measuring growth that is used in multiple districts nationwide. At Chicago Public Schools (CPS), the value-added metric has been developed in collaboration with academic experts from the University of Wisconsin.

The value-added metric is a more informative, accurate, and equitable way to measure how your students progress from one year to the next. It is more informative because it measures the actual amount of growth, in ISAT scale score points; more accurate because it reflects growth at all levels of student achievement; and more equitable because it accounts for differences in student populations.

Student progress varies by grade, prior performance and demographics. The value-added metric accounts for these factors, comparing students along the following dimensions: grade level, prior ISAT score, IEP status, ELL status, participation in the Homeless Education Program, free or reduced-price lunch eligibility, gender and the number of times a student changed schools between ISAT examinations.

Value-added metrics provide data to help you answer questions such as: How much does a school contribute to student growth? and How does this impact differ across grade levels? The value-added metrics are an additional piece of information to help you make informed decisions that can lead to better instruction for your students - ensuring that every child in every school is on track at every stage in his or her CPS career to graduate prepared for success in post-secondary school and work.

On average, the year-to-year gain between 2008 and 2009 for your students in reading was <u>0.5 scale score points higher</u> than similar students district-wide.

On average, the year-to-year gain for your students in math was <u>3.7 scale score points higher</u> than similar students district-wide.



### SCHOOL-LEVEL VALUE-ADDED 2008-2009

| | Value-Added Ranking in CPS |
|---|---|
| Reading | 60th percentile |
| Math | 91st percentile |

### GRADE-LEVEL VALUE-ADDED 2008-2009

| | Reading | | Math | |
|---|---|---|---|---|
| | Value-Added | Value-Added Ranking in CPS | Value-Added | Value-Added Ranking in CPS |
| 3rd to 4th | | 36th percentile | | 70th percentile |
| 4th to 5th | | 52nd percentile | | 75th percentile |
| 5th to 6th | | 85th percentile | | 88th percentile |
| 6th to 7th | | 42nd percentile | | 60th percentile |
| 7th to 8th | | | | |

**Inside**

Growth and attainment district-wide

Value-added as a school-wide diagnostic

Analysis of student growth

Scores are only reported if number of students > 10. See _____ number of students.

**EXHIBIT 27**

To:        Joe Kallas, Area One Instructional Officer

From:      Odette Langer, Principal John Barry Elementary School

Date:      January 12, 2010

After our discussion and agreement I am giving you notice that I will retire at the end of the 2009-2010 school year.

I will prepare the school budget and the school improvement plan for your approval and any modifications you may desire. I will continue with my administrative duties to keep the school running smoothly and I will work to help get the school off of probation within the minimum amount of time allowed by policy.

On the date that you receive this letter please mail to me your confirmation that you are allowing me to retire at the end of the 2009-2010 school year.

*Odette Langer*

Odette Langer

**EXHIBIT 28**

2

**Langer, Odette**

| | | | |
|---|---|---|---|
| **From:** | Kallas, Joseph G | | |
| **To:** | Langer, Odette | **Sent:** | Wed 1/13/2010 11:41 AM |
| **Cc:** | | | |
| **Subject:** | Receipt of letter | | |
| **Attachments:** | | | |

I received, via certified mail, your notice of retirement. Please remember that all CPS/CTPF paperwork should be completed as soon as possible. This will be allowed, without any further action, provided paperwork is completed in a timely manner.

Joe Kallas

Chief Area Officer, Areas One and Six

Chicago Public Schools

6323 N. Avondale

Chicago, IL 60631
773-534-1113 (direct line)

773-534-1083 (Ana Rios, Administrative Assistant)

773-534-1082 (facsimile)

**EXHIBIT 29**

February 25, 2010

Mr. Kallas,

I am rescinding my previous letter's statement that I will retire at the end of the 2009-2010 school year.

I will continue to work for the good of Barry School.

Odette Langer

**EXHIBIT 30**



Joe Kallas
Chief Area Officer

February 25, 2010

Ms. Odette Langer
Principal
John Barry Elementary School

Ms. Langer:

Per your letter dated January 12, 2010 (attached), your last day as principal of Barry Elementary School will be June 30, 2010.

Thank you.

Joseph G. Kallas
Chief Area Officer
Area One
Chicago Public Schools

**EXHIBIT 31**

*Educate • Inspire • Transform*

June 29, 2010

Mr. Ron Huberman, President/CEO
Chicago Board of Education
Chief Executive Office
125 S. Clark St.
5th Floor
Chicago, Il 60603

Modification of Previous Request

**Re: Odette Langer Request to Find that She Did Not Submit a Valid Notice of
Intent to Retire, and If it is Found that She Did, then it is Requested that it
be Rescinded under Board Rule 4-16(b)**

This request modifies my original request of June 18, 2010 which I should have
worded and arranged somewhat differently.

I am writing to have the (conditional) notice of my retiring on June 30, 2010 as
Contract Principal of John Barry Elementary School (which contract ends on June 30,
2011) removed from Chicago Public Schools files.

In the alternative, if you disagree with the basis of the above being done, despite the
supporting documentary evidence, I request that the notice be rescinded under Chicago
Board of Education Board Rule 4-16(b).

I

**Bases for the Notice of Retirement being removed from CPS Files.**

1. In correspondence on January, 13, 2010, Mr. Joe Kallas, Areas 1 and 6
Instructional Officer, stated that he received my notice of retirement and stated that I will
be allowed to retire at the end of the school year provided that all CPS/CTPF paper work
be completed as soon as possible in a timely manner. I did not, at any time, go to the
Human Resources Department to fill out their form for requesting retirement or go to the
Pension Board to fill out any of their paperwork nor did I file anything any place else
that stated that I was retiring. Therefore, I did not complete any CPS/CTPF paperwork
that Mr. Kallas required me to fill out as soon as possible in order for me to be allowed to
retire, and which might have been possible to fill out in one day.

2. On February 25, 2010, I sent Mr. Kallas a letter saying that I was rescinding my
previous letter's statement that I am retiring at the end of the 2009-2010 school year. He
received the letter on February 26, 2010.

3. On February 27, 2010 Mr. Kallas mailed me a letter, having a February 25, 2010
date, stating "Per your letter (attached) your last day as principal of Barry Elementary
School will be June 30, 2010.

**EXHIBIT 32**

1

4. Mr. Kallas had made me an offer that he would let me retire at the end of the school year only if I filled out the necessary paperwork as soon as possible. I did not fill out any of the paperwork and instead rescinded my notice of retirement. Mr. Kallas after receiving my letter rescinding my notice of retirement, then sent me a letter stating that he was accepting my notice of retirement. Based on what Mr. Kallas wrote on January 13, 2010, there should not be any notice of my retiring at the end of the school year. I hope that you agree with me and that I will be permitted to complete my contract which ends June 30, 2011.

## II
## Board Rule 4-16(b) Rescinding of Notice of Retirement

If you disagree with the above despite the evidence, and believe that there was a valid accepted notice of retirement, then I am requesting that it be rescinded in accord with the Rules of the Board of Education of the City of Chicago, Rule 4-16(b) for the following reasons:

1. I currently have a contract with the Board to serve as the contract principal of John Barry Elementary School. The contract does not expire until June 30, 2011. I therefore have a "firm offer" to fill a vacant position for which a Type 75 Administrative certificate is required;

2. I have submitted this request to you before the effective date of any notice of intent to retire.

3. I have served the Board for many years and received a number of honors including: highest ratings possible as an Assistant Principal; passed the examination for superintendent of schools, although I did not have the required courses; and received an outstanding leadership award. I was one of the fifty candidates that applied to become principal of Barry School. I became principal at the time that the school was taken off of controlled enrollment and brought the school from a difficult situation of an overcrowded school with insufficient classrooms or personnel having most of the grade 3 through 6students who would be taking tests, from other schools and I made the school function, so that the school now borders on the 2010-2011 school year Elementary Performance Policy Results Level I with 28 points. (You will probably have the official form soon, but the data upon which it has been based has been released.) I am uniquely qualified to fill the position of Principal of Barry School.

4. I have not participated in any Board sponsored retirement incentive programs of which I would need to repay monies paid by the Board to me; and

5 I have not submitted an application for retirement or other benefits from a Pension Fund to which the Board makes contributions.

For all of the above reasons, I request that the CPS CEO find that I did not file a notice of intent to retire and therefore my contract is still in effect; and in the alternative I request that the Chicago Board of Education permit me to rescind the notice of intent to retire that was allegedly

2

previously submitted. If you need any further information, please do not hesitate to contact me. I appreciate your time and consideration in this matter.

Respectfully Yours,

Odette Langer, Principal, John Barry Elementary School
6247 N. Francisco Ave.
Chicago, IL 60659
Phone: 773 973 0399

3